PUBLISHED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **EDWARD N. BELL**, ) | |
| ) | |
| Petitioner, ) | Case No. 7:04CV00752 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **WILLIAM PAGE TRUE,** ) | By: James P. Jones |
| **WARDEN, SUSSEX I STATE** ) | Chief United States District Judge |
| **PRISON,** ) | |
| ) | |
| Respondent. ) | |

*Matthew K. Roskoski, Latham & Watkins, L.L.P., Washington, D.C., and James G. Connell, III, Devine & Connell, P.L.C., Fairfax, Virginia, for Petitioner; Katherine P. Baldwin, Senior Assistant Attorney General of Virginia, Richmond, Virginia, for Respondent.*

Edward N. Bell was convicted by a Virginia jury of the murder of Winchester police officer Ricky L. Timbrook and sentenced to death. After unsuccessfully challenging his conviction and the imposition of the death penalty both on direct appeal and in state habeas corpus proceedings, Bell now petitions for a writ of habeas corpus from this court.

Through his appointed attorneys, Bell raises a number of constitutional claims. Among other things, he contends that the state knowingly used perjured testimony against him and failed to disclose exculpatory evidence. He argues that one of his

attorneys had a conflict of interest that adversely affected the defense. He also asserts that he is mentally retarded and thus cannot legally be executed.

After a very careful review of the record, I find that all of Bell's claims except one are without merit and should be dismissed. However, I will hold an evidentiary hearing on Bell's claim that his lawyers failed to present available mitigating evidence at the sentencing phase of the trial, leaving the jury with no alternative but to fix the death penalty in lieu of life imprisonment without parole. I make no decision on the claim at this point, but I find that Bell is entitled to an opportunity to prove his assertion at a hearing.[1]

While largely circumstantial, the evidence at trial that Bell murdered police officer Timbrook was very strong, and I am convinced that none of the errors Bell complains of affected the fundamental fairness of his conviction. Nevertheless, at this point, I cannot say that the jury's decision to sentence Bell to death was not unaffected by the alleged errors of his attorneys.

The full reasons for my decisions in this case follow.

---

[1] For a full discussion of this claim, see pages 63-70, below.

TABLE OF CONTENTS

I.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

      A.    State Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

      B.    Federal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

III.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

      A.    Claim I—*Napue* and *Brady* Violations . . . . . . . . . . . . . . .   17

      B.    Claim II—Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . .   49

      C.    Claim III—Mental Retardation . . . . . . . . . . . . . . . . . . . . . .   51

      D.    Claim IV—Ineffective Assistance of Counsel . . . . . . . . . . .   62

      E.    Claim V—Future Dangerousness . . . . . . . . . . . . . . . . . . . . .   80

      F.    Claim VI—Violation of Bell's Right to Trial
            by Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102

      G.    Claim VII—Violation of Bell's Right to be
            Present at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   123

      H.    Claim VIII—Deprivation of the Presumption
            of Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   130

      I.    Claim IX—Violation of the Vienna Convention
            on Consular  Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . .   135

      J.    Claim X—Defects in Virginia's DNA Testing
            Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   150

      K.    Claim XI—Random and Arbitrary

Case 7:04-cv-00752-JPJ   Document 92   Filed 02/07/06   Page 3 of 162   Pageid#: 1659

Administration of the Death Penalty in
Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

L.     Claim XII—Unconstitutional Execution
Procedures in Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

## I. FACTS.

In affirming Bell's conviction and sentence on direct appeal, the Supreme Court of Virginia summarized the facts in the light most favorable to the prosecution as follows:

> On the evening of October 29, 1999, Sergeant Timbrook and two probation and parole officers were working together in a program known as Community Oriented Probation and Parole Services. One aspect of Sergeant Timbrook's responsibilities was to assist the probation officers in making home visits to individuals on probation or parole. On that particular evening, these three individuals were patrolling in an unmarked car in Winchester and were, among other things, searching for Gerrad Wiley, who was wanted for violating the terms of his probation.

> The officers went to Wiley's residence on Woodstock Lane in Winchester several times that evening to no avail. Just before midnight, when they returned to Wiley's residence for the sixth time, they saw an individual standing in a grassy area between a trash dumpster and an apartment building. As one of the probation officers and Sergeant Timbrook exited the vehicle and approached that individual, who was later identified as Daniel Charles Spitler, another person, who had "dipped behind in the shadows," began running away. Sergeant Timbrook pursued that individual while calling for assistance on his radio.

-4-

Spitler identified the individual who ran from Sergeant Timbrook as Bell. Spitler testified that, on the evening in question, he was in the area of Woodstock Lane for the purpose of obtaining cocaine from Wiley. After no one answered his knock on the door of Wiley's residence, Spitler started walking down a nearby alley where he encountered Bell. Spitler did not tell Bell that he wanted cocaine, but, according to Spitler, Bell "put his hands on [Spitler] like to pat [him] down to check and see if [Spitler] had a wire on [him]." During that encounter, Sergeant Timbrook and the two probation officers arrived in the unmarked vehicle.

When the vehicle's headlights illuminated Spitler and Bell, Spitler started walking toward the headlights, but Bell stepped into the shadows of a building. Spitler identified Sergeant Timbrook as one of the individuals who emerged from the vehicle. According to Spitler, Bell then started running away and Sergeant Timbrook chased after him, yelling "We have one running. Stop." Spitler lost sight of Bell and Sergeant Timbrook when they ran behind a building, but Spitler testified that he heard a shot soon thereafter.

Sergeant Timbrook chased Bell along several streets and down an alley between two houses located at 301 and 303 Piccadilly Street. These houses were separated by a fence approximately two or three feet in height. As Sergeant Timbrook started to climb over the fence, a shot rang out. A police officer, Robert L. Bower, who had responded to Sergeant Timbrook's radio call for assistance, described the incident in this manner:

> [A]s [Sergeant Timbrook] started to cross over, I took my eyes off of him, and directed it toward the subject. I noticed it stopped. And, I saw a, what appeared to be a left shoulder as it stopped. All I could was . . . it was like a black material . . . . As soon as I saw it stop, I looked back at [Sergeant] Timbrook to say something, at which time I heard the shot. And, I saw [Sergeant] Timbrook falling.

Sergeant Timbrook's body was found lying on the ground with his feet close to the fence and his upper torso leaning against a wall. His

-5-

gun was still in its holster. Sergeant Timbrook was transported to a local hospital where he was pronounced dead. The cause of death was a single gunshot wound above his right eye, caused by a bullet which was fired from a distance of between six and eighteen inches.

Brad Triplett, one of the probation officers who had been patrolling with Sergeant Timbrook that evening, ran in a parallel direction during part of Sergeant Timbrook's pursuit of Bell. At one street intersection, he saw Sergeant Timbrook running after the "same dark[ly] dressed figure" who had originally fled from Sergeant Timbrook. Triplett described that person's clothing as a "dark black type of jumpsuit, nylon material," with "reflective like stripes on the jacket." Several times during the pursuit, Triplett heard Sergeant Timbrook yelling, "Stop running. Police." He also heard the gunshot.

The police searched the area for the suspect throughout the night by securing a perimeter around the neighborhood where the shooting had occurred and by using a helicopter equipped with a heat-sensitive "Forward Looking Infrared" camera and a spotlight. At one point during the search, Officer Brian King spotted an individual lying on the back steps of a house located at 305 Piccadilly Street.[n2] King stated that the person was wearing a dark colored jacket with reflective strips on the sleeves that "li[t] up like a Christmas [t]ree" when he shined his flashlight on the individual. The person then stood up and disappeared behind a bush.

[n2] The shooting occurred in the area between 301 and 303 Piccadilly Street.

Emily Marlene Williams, who lived at 305 Piccadilly Street, testified that she heard the gunshot on the evening in question and about five minutes later heard a "crash" in the basement of her house. After she told the police about the noise in her basement, the police evacuated her and her family from their home. The following morning, the police discovered Bell, a Jamaican national, hiding in a coal bin in the basement of the Williams' residence. He was wearing a "LUGZ" black nylon jacket and a black beret cap with a gold pin. The jacket had reflective stripes on the sleeves. Spitler identified both of these items of clothing

-6-

as those that Bell had been wearing on the evening when Sergeant Timbrook was shot. Before Bell was transported from the Williams' residence to the police department, a gunshot residue test was administered to Bell's hands and the recovered particles were subsequently identified as gunshot primer residue. During a search of the backyard of the Williams' residence the day after Bell was apprehended, a deputy sheriff found a pearl-handled, Smith and Wesson .38 Special double action revolver. The gun was located under the edge of a porch on the Williams' house and was covered with leaves and twigs. Forensic testing established that this handgun fired the bullet that killed Sergeant Timbrook. Forensic testing of DNA that was recovered by swabbing the grips, butt, trigger, and trigger guard of this revolver could not eliminate Bell as a co-contributor of that DNA, which was consistent with a mixture of DNA from at least three individuals.

When questioned by the police after his arrest, Bell admitted that he had been on Woodstock Lane when "a white guy" allegedly began bothering him for information. Bell said that when a car drove up and a man got out of the car, he "was scared" and ran. He said he did not know who was chasing him or why, and that when he heard a shot fired, he hid in the basement of the house where he was later discovered. Bell denied having a gun. However, while Bell was confined in jail awaiting trial, he told another inmate that he shot Sergeant Timbrook, threw the gun underneath a porch, and then broke into a house and changed clothes in the basement.

Justin William Jones testified that, around nine o'clock on the evening of the shooting, he saw Bell in the vicinity of Piccadilly Street. According to Jones, Bell showed him a revolver and asked if Jones knew of anyone who wanted to buy a weapon. Jones identified the pearl-handled, .38 caliber revolver introduced at trial as the same weapon that Bell had shown him.

The evening Sergeant Timbrook was shot was not the first encounter between Timbrook and Bell. Sergeant Timbrook had arrested Bell for carrying a concealed weapon in May 1997. The following year, in September 1998, Sergeant Timbrook was present during the execution of an Immigration and Naturalization Service order to detain Bell. Eight

months later, Sergeant Timbrook assisted in executing a search warrant at Bell's home.  Bell was present during that search.  In the summer of 1999, one of Bell's friends heard Bell state, as Sergeant Timbrook drove by in a vehicle, "Somebody needs to bust a cap in his ass."  Another of Bell's acquaintances testified that she heard Bell say that he would like to see Sergeant Timbrook dead, and that if he ever came face to face with Sergeant Timbrook, he would shoot Sergeant Timbrook in the head because he knew that Sergeant Timbrook wore a bullet-proof vest.

*Bell v. Commonwealth*, 563 S.E.2d 695, 701-703 (Va. 2002) ("*Bell I*").

During the penalty phase of the trial, the state presented the following evidence on Bell's criminal history, Bell's propensity for violence, and the effect of Sergeant Timbrook's death on Timbrook's family:

A police officer from Jamaica provided information about Bell's commission of the crimes of assault and destruction of property in 1985. In 1997, an officer with the Winchester Police Department found a .38 caliber handgun concealed in the trunk of a car being driven by Bell. The serial number of the gun had been filed off.  An officer with the West Virginia State Police stated that when he stopped Bell for speeding in 1999, Bell gave him a false name.  When the officer started to arrest Bell and place him in handcuffs, Bell ran away into a cornfield.  Another West Virginia law enforcement officer found five .38 caliber rounds of ammunition on Bell's person during a "stop and frisk" in 1999.  Finally, two employees of the jail where Bell was confined while awaiting trial testified that Bell had threatened them.

Another witness, Billy Jo Swartz, testified about an incident in 1997 when Bell grabbed her head and slammed it into his car.  He also held a gun to her head.  During the same incident, Bell got into a fight with his pregnant girlfriend and knocked her to the ground.  Swartz further stated that she had seen Bell with illegal drugs.  Other witnesses likewise testified about buying illegal drugs from Bell.

-8-

Members of Sergeant Timbrook's family described their relationship with him and the effect that his death has had on the family. His wife was pregnant with their first child when Sergeant Timbrook was killed. The only evidence that Bell introduced during the penalty phase was from his sister and father.

*Id.* at 703.

## II. PROCEDURAL HISTORY.

### A. STATE PROCEEDINGS.

On January 11, 2000, a grand jury in the City of Winchester, Virginia, indicted Bell for capital murder, alleging that on October 29, 1999, Bell deliberately, willfully, and with premeditation killed a police officer for the purpose of interfering with the performance of the officer's official duties, in violation of section 18.2-31(6) of the Code of Virginia.[2] *See* Va. Code Ann. § 18.2-31(6) (Michie 2004). Counsel was appointed for Bell and he was tried by a jury in the Circuit Court of the City of Winchester.[3] The jury found Bell guilty of capital murder on January 25, 2001, and,

---

[2]   The grand jury also indicted Bell for three other crimes relating to the incidents on October 29, alleging that he used a firearm during the commission of a murder, in violation of section 18.2-53.1; possessed cocaine while simultaneously, knowingly, and intentionally possessing a firearm in violation of section 18.2-308.4; and possessed cocaine with the intent to distribute, in violation of section 18.2-248. *See* Va. Code Ann. §§ 18.2-31(6), -53.1, -248, -308.4 (Michie 2004 & Supp. 2005).

[3]   Bell was also convicted for the use of a firearm, possession of a firearm while in possession of cocaine, and possession of cocaine with intent to distribute. The jury sentenced Bell to imprisonment for terms of three years, five years, and forty years respectively for

on January 26, 2001, fixed his punishment at death. The jury based the death sentence on its finding that there was a probability that Bell would commit criminal acts of violence in the future that would constitute a continuing serious threat to society. *See* Va. Code Ann. § 19.2-264.2 (Michie 2004). The trial court entered a final judgment on June 12, 2001, sentencing Bell to death in accordance with the jury's verdict.

Bell appealed to the Supreme Court of Virginia from his capital murder conviction and sentence of death.[4] Bell presented twenty-eight assignments of error, but the court considered eleven of those assignments of error waived for failure to brief them on appeal. *Bell I*, 563 S.E.2d at 703. The court unanimously affirmed the conviction and sentence on June 7, 2002. *Id.* at 719. Bell filed a petition for rehearing on July 3, 2002, which the court denied on July 30, 2002. Thereafter, Bell sought a writ of certiorari from the United States Supreme Court, which was denied on January 13, 2003. *Bell v. Virginia*, 537 U.S. 1123 (2003).

---

these convictions, but the trial court reduced the jury's sentence for possession of cocaine with intent to distribute to ten years. Bell did not challenge any of these convictions or sentences on appeal.

[4] A sentence of death is subject to mandatory review by the Supreme Court of Virginia, in addition to consideration of any specific errors asserted on appeal. *See* Va. Code Ann. § 17.1-313 (Michie 2003).

-10-

Post-conviction counsel was appointed, and Bell filed his initial petition for a writ of habeas corpus with the Supreme Court of Virginia on March 14, 2003.[5] This initial petition was ninety-five pages long, and the court denied Bell's accompanying motion to exceed the fifty-page limit established by its rules. Bell filed a corrected petition on April 21, 2003, conforming to the page limitation. This corrected petition asserted fourteen claims and requested expert assistance, discovery, and an evidentiary hearing.[6] The state filed a motion to dismiss Bell's petition on May 21, 2003. On

---

[5]    In death cases, the Supreme Court of Virginia has exclusive habeas corpus jurisdiction, although the court may refer specific issues to the trial court to conduct an evidentiary hearing and make findings of fact and recommended conclusions of law. *See* Va. Code Ann. § 8.01-654(C)(1)-(3) (Michie Supp. 2005). Where, as here, the petitioner claims to be mentally retarded, the Supreme Court of Virginia is directed to remand the case to the trial court to make that determination, if the claim of mental retardation is not frivolous. *See* Va. Code Ann. § 8.01-654.2 (Michie Supp. 2005).

[6]    Bell's corrected state habeas petition asserts that:

I.      The prosecution violated Bell's due process rights when they failed to disclose exculpatory evidence and knowingly provided false testimony.

II.     Mr. Bell is mentally retarded.

III.    Trial counsel failed to investigate, identify, or present available mitigating evidence for the penalty phase of Mr. Bell's trial.

IV.     Trial counsel was ineffective for failing to object to verdict forms that did not comport with the trial court's instructions, Virginia law, or federal constitutional requirements.

V.      Mr. Bell's rights to trial by jury were violated.

-11-

January 9, 2004, Bell filed a supplement to his petition that alleged seven additional claims and presented eight new exhibits.  In a lengthy opinion, the Supreme Court of Virginia denied Bell's supplement and request for expert assistance and granted the state's motion to dismiss Bell's habeas petition.  *Bell v. True*, No. 030539, slip op. at 30-31 (Va. April 29, 2004) ("*Bell II*").

---

VI.    Mr. Bell was not present at significant portions of his trial.

VII.    The trial court shackled Mr. Bell without any finding of need.

VIII.    The indictment failed to state a death eligible capital offense by not including specific aggravating factors.

IX.    The aggravating factor of future dangerousness is unconstitutional because it is vague and the statutory scheme does not require that it be found beyond a reasonable doubt.

X.    The jury selection process denied Mr. Bell the right to a trial by a jury selected in a non-discriminatory manner and from a fair cross-section of the community.

XI.    New studies indicate that the death penalty as applied in Virginia is unconstitutional.

XII.    Pretrial publicity was so pervasive that venue should have been changed.

XIII.    Mr. Bell did not receive consular notification as required by the Vienna Convention.

XIV.    Trial and appellate counsel were ineffective.

(Corrected State Pet. For Writ of Habeas Corpus (capitalization altered).)

Bell filed a petition for rehearing on May 28, 2004, and filed a motion to amend his habeas petition on August 18, 2004. The Supreme Court of Virginia denied the motion to amend on September 2, 2004, and denied the petition for rehearing on November 17, 2004. The Winchester Circuit Court then scheduled Bell's execution for January 7, 2005.

## B. FEDERAL PROCEEDINGS.

On December 22, 2004, Bell filed a motion in this court to stay his scheduled execution, a notice of intent to file a petition for a writ of habeas corpus pursuant to 28 U.S.C.A. § 2254 (West 1994 & Supp. 2004), and a motion to appoint counsel. This court stayed Bell's execution pending consideration of his federal habeas petition and appointed counsel. In an amended habeas petition filed June 13, 2005,[7] Bell sets forth the following twelve grounds for federal habeas relief:

> I. The prosecution knowingly elicited false testimony from witnesses in violation of *Napue v. Illinois*, and failed to disclose exculpatory evidence in violation of *Brady v. Maryland*;

---

[7] Bell initially contended that he should not be required to file his habeas petition until August 11, 2005, basing this argument on the one-year period of limitations established by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). I rejected this contention, but did allow him additional time to prepare and file the petition. *See Bell v. True*, 356 F. Supp. 2d 613, 614-616 (W.D. Va. 2005), *reconsideration denied*, 366 F. Supp. 2d 403, 409 (W.D. Va. 2005), *mandamus denied sub nom. In re Bell*, No. 05-9 (4th Cir. May 16, 2005). Bell timely filed his petition on May 17, 2005. On June 13, 2005, prior to the respondent's answer, he filed an amended petition. The state objected to the amended petition, but I allowed it. *See Bell v. True*, 373 F. Supp. 2d 613, 614-15 (W. D. Va. 2005).

-13-

II.     Bell's attorney had an actual conflict of interest which adversely affected his performance, violating Bell's right to be represented by counsel with undivided loyalties;

III.    Bell is mentally retarded, prohibiting his execution;

IV.     Bell's trial counsel's representation fell below the objective standard of reasonableness and prejudiced his defense;

V.      The jury's assessment of future dangerousness violated Bell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments;

VI.     Bell's rights to trial by jury were systematically violated;

VII.    The trial court violated Bell's right to be present at his own trial;

VIII.   Bell was shackled in view of the jury, depriving him of the presumption of innocence;

IX.     Bell was deprived of his right under the Vienna Convention on Consulate Relations to be notified of his right to communicate with the Jamaican Consulate;

X.      Defects in Virginia's DNA testing procedures entitle Bell to habeas relief;

XI.     Virginia administers the death penalty in an unconstitutionally random and arbitrary manner;

XII.    Virginia's execution procedures violate Bell's Eighth and Fourteenth Amendment rights.

(Pet. at 44-236).

The state has filed an answer and motion to dismiss.[8] The motion to dismiss has been extensively briefed by the parties and oral argument was held on September 21, 2005. Accordingly, the motion to dismiss is now ripe for decision.

## III. ANALYSIS.

In his federal habeas petition, Bell presents twelve claims for relief. In analyzing each of these claims, I must first consider whether the claim is procedurally defaulted. A claim is procedurally defaulted if: (1) the state court relied on an adequate and independent state procedural rule to deny relief on that claim, *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998); or (2) the petitioner failed to present a claim to the state court and that claim may not now be presented, *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Bassette v. Thompson*, 915 F.2d 932, 936 (4th Cir. 1990). If a claim is procedurally defaulted, then petitioner must fail on that claim unless he can show that cause and prejudice or a fundamental miscarriage of justice might excuse his default. *Fisher v. Angelone*, 163 F.3d at 844.

If a claim was adjudicated in the state court on the merits, it is not procedurally defaulted and I must review the state court's decision on the merits. When reviewing

---

[8] For convenience, throughout this opinion I will refer to the prosecution and the respondent warden as "the state."

such claims, the AEDPA provides that a federal court may grant habeas relief only if the state court's adjudication resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C.A. § 2254(d)(1), (2).

A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision involves an "unreasonable application" of clearly established federal law if the court identifies the correct governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "It is not enough that a federal habeas court, in its 'independent review of the legal question' is left with a 'firm conviction' that the state court was 'erroneous'. . . . [r]ather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (quoting *Andrade v. Attorney Gen. of Cal.*, 270 F.3d 743, 753 (9th Cir. 2001), *overruled on other grounds*, *Lockyer v. Andrade*, 538 U.S. 63 (2003)).

-16-

A state court's factual determination is entitled to a "presumption of correctness." 28 U.S.C.A. § 2254(e)(1). That presumption is rebutted only by "clear and convincing" evidence that the state court decision was "based on [an] unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.*; 28 U.S.C.A. § 2254(d)(2); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). The presumption applies equally to the factual findings of state courts that conducted postconviction proceedings. *Howard v. Moore*, 131 F.3d 399, 422 (4th Cir. 1997) (citing *Rushen v. Spain*, 464 U.S. 114 (1983) (per curiam), and *Johnson v. Maryland*, 915 F.2d 892, 896 (4th Cir. 1990)).

Even if a writ of habeas corpus is authorized under § 2254(d), a petitioner still is not entitled to relief unless he can show that any constitutional error committed had a substantial and injurious effect or influence on the jury's verdict . *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (applying *Brecht* after enactment of the AEDPA)).

With these principles in mind, I will address each of petitioner's claims in turn.

A. CLAIM *I—NAPUE* AND *BRADY* VIOLATIONS.

In his first claim for federal habeas relief, the petitioner asserts that the prosecution knowingly elicited false testimony in violation of *Napue v. Illinois*, 360

-17-

U.S. 264 (1959), and failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). While the *Napue* and *Brady* claims have many issues in common, I will consider each in turn for the sake of clarity.

### 1. *Napue* Violations.

In *Napue*, the Supreme Court explained that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" and that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. In the Fourth Circuit, a *Napue* claim requires a showing of both (1) the falsity and materiality of testimony and (2) the prosecutor's knowledge of the falsity. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). In this context, false testimony "is material if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The petitioner alleges *Napue* violations in connection with the testimony of Timothy Berry, Terry Lee Johnson, Lieutenant Tim Rice, and Justin Jones.

### 2. Timothy Berry.

Bell contends that Timothy Berry perjured himself at Bell's trial when he testified that (1) Bell had said someone needed to "bust a cap in [Timbrook's] ass" and (2) he was not offered any consideration for his testimony. Bell further claims that

-18-

this false testimony was a result of coercion by the prosecution, and that this misconduct had a reasonable possibility of affecting the jury's judgment given that Berry's testimony supplied motive. This claim was adjudicated on the merits in state habeas review, and the Supreme Court of Virginia found that the allegations of perjury regarding Berry's testimony were not supported by the record. Accordingly, the court denied Bell's *Napue* claim relating to witness Berry.

The factual determination of the state habeas court, finding that Berry had not committed perjury, must be afforded the presumption of correctness. The fact that the state court dismissed this *Napue* claim on the basis of affidavits, without holding an evidentiary hearing, does not disturb this presumption. *See Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997) (holding that findings of fact based on affidavits alone are generally sufficient to warrant the presumption under § 2254(d)). On review of the record, I find that the state court's factual findings on this claim and accompanying decision to deny Bell's Berry *Napue* claim were reasonable and deny relief.

The affidavit from Berry that Bell presented on state habeas review stated that Ricky Bush, a Winchester police officer, (1) threatened to send Berry to jail for an alleged crack sale if he did not testify and (2) coached Berry as to what he should say on the stand. Berry also alleged in the affidavit that he never actually heard Bell use

-19-

Timbrook's name or directly threaten Timbrook. Nonetheless, the record before the state court contained evidence sufficient to refute these claims.

The record shows that Berry repeatedly and specifically described to authorities the threat that Bell made on Timbrook's life. In sworn grand jury testimony, Berry testified that Bell, when referring to Timbrook, said he would "like to bust the cop in his ass." (Berry Grand Jury Test. at 143, Resp't's State App., Ex. 1.)[9] Similarly, in interviews with Sergeant Bush and FBI agent Stiefvater, Berry stated that he heard Bell comment that "he would like to put a cap in [Timbrook's] ass." (Berry FBI Interview at 2, Resp't's State App., Ex. 4.) Furthermore, an affidavit from Bush that was presented to the state court stated that Bush told Berry the police would not give him any consideration or benefit for his information and that neither Bush nor Stiefvater had any knowledge upon which to base a drug charge against Berry. Based

---

[9] The state's filings cited here include the appendix to its filing in the state habeas action ("Resp't's State App."). "J.A.," preceded by the volume number, refers to the joint appendix filed by the parties in Bell's direct appeal, which is a part of the record in this case. Other state court records include the petitioner's appendix to his state habeas petition ("Pet'r's State App."), the petitioner's motion to supplement the petition for rehearing ("Pet'r's Mot. Supp. Pet. Reh'g"), and the petitioner's supplement to claims I and XIV ("Pet'r's Supp. State App.").

Documents filed by the petitioner for the first time with this court include the appendix to the petitioner's initial federal habeas petition ("Pet'r's App."), the petitioner's supplemental appendix ("Pet'r's Supp. App."), and his second supplemental appendix ("Pet'r's Second Supp. App.").

-20-

on this evidence, I find that the state court's finding that Bell's perjury claim regarding Berry lacked merit was reasonable. Therefore, I deny this *Napue* claim.

### 3. TERRY LEE JOHNSON.

Similar to his contentions with regard to Berry, Bell claims that the prosecutor knew of and suborned material false testimony from witness Terry Lee Johnson. Johnson's key testimony was that, while he and Bell were in jail together, Bell confessed to shooting Sergeant Timbrook. Bell claims that Johnson lied when he testified that Bell confessed to the murder and also when he testified that he did not receive any promises in exchange for his testimony. This *Napue* claim was adjudicated on the merits in state habeas review, thus I must again apply the deferential standard of review set forth in § 2254(d).

The Supreme Court of Virginia denied Bell's Johnson *Napue* claim on the merits for the same reasons that it rejected the Berry *Napue* claim. Specifically, the court found that "[t]he record, including the affidavits of police officers who interviewed Berry and Johnson, demonstrates that . . . no consideration was promised in exchange for . . . Johnson's testimony" and that Johnson did not state in his affidavit that his sworn trial testimony was a lie. *Bell II*, slip op. at 2. Bell argues that the state court's decision on this claim was contrary to or involved an unreasonable application of clearly established federal law and that it was based on an unreasonable

-21-

determination of the facts in light of the record before the state court. Alternatively, Bell argues that, even if the Supreme Court of Virginia's decision was reasonable, he has rebutted the finding of no perjury with a new affidavit from Terry Lee Johnson. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's decision regarding Johnson's testimony was reasonable and that Bell has failed to overcome the presumption of correctness that attaches to that decision. Therefore, I deny relief on the Johnson *Napue* claim.

Bell argues that habeas relief is available under § 2254(d)(1) because the Supreme Court of Virginia unreasonably applied federal law when it struck an affidavit from Jonathan Sheldon and refused to give Bell a hearing on his Terry Lee Johnson claim.

The Supreme Court of Virginia was presented with an affidavit from Johnson and an affidavit from attorney-investigator Jonathan Sheldon in support of the Johnson *Napue* claim. The Sheldon affidavit recounted several things that Johnson allegedly told Sheldon, including that (1) Johnson's conversations with the prosecutor were recorded; (2) Johnson told both the detectives and the prosecutor that he didn't know anything about Bell's case; (3) the prosecutor promised Johnson work release, a more favorable facility, and release from prison in "nine months, tops" in exchange for his testimony; and (4) Johnson would not sign an affidavit stating that his trial

testimony was a lie because he did not want to be prosecuted for perjury. (Sheldon Aff., Pet'r's State App., Ex. 28.) The court granted the State's motion to strike this affidavit on hearsay grounds, however, and thus the court did not consider it when it made the determination that the Johnson *Napue* claim was without merit. Therefore, the only evidence the court considered in support of the Johnson *Napue* claim was the Johnson affidavit. In this affidavit Johnson stated that: (1) the detectives reviewed newspaper articles about Bell's case with him, (2) conversations between him and the police regarding Bell were recorded, (3) the police let him walk freely in the courthouse, (4) the police gave him gifts of cigarettes and sandwiches, (5) the prosecutor threatened him with a three-year mandatory minimum sentence if he refused to take the oath swearing to the truth of his trial testimony,[10] and (6) he was afraid to cooperate further with Bell's investigators because of fear that the police and prosecutors would come after him. (Johnson Aff., Pet'r's State App., Ex. 9.)

Bell claims that the Supreme Court of Virginia's method of examining the record constituted an unreasonable application of federal law based on the Fourth

_____

[10] The day following Johnson's testimony, the trial court was informed that Johnson had not been sworn, and the state requested that the court reopen its case and swear Johnson retroactively. The defense objected, but the court ruled in the state's favor, administered an oath to Johnson with respect to his prior testimony, and instructed the jury that they could consider the testimony sworn.

-23-

Circuit case of *United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995).[11]  *Mason* held

that it was error for a court to ignore hearsay affidavits prepared by defense counsel

when considering whether to conduct a competency hearing.  *Id*. at 1292.  *Mason* was

a pre-AEDPA case, however, and the "decision . . . was grounded in a statute which

plainly requires judges to grant a competency hearing when a defendant has shown

'reasonable cause.'"  *United States v. Cropp*, 127 F.3d 354, 362 (4th Cir. 1997)

(quoting 18 U.S.C. § 4241(a)) (qualifying *Mason*).  The Supreme Court of Virginia

relied on its own state evidentiary rules in striking the Sheldon affidavit, and it can

hardly be said that failure to consider such inadmissible hearsay when considering a

*Napue* claim constitutes error, let alone an unreasonable application of federal law.

 Bell next contends that habeas relief is independently available for his Johnson

*Napue* claim under § 2254(d)(2) because the Supreme Court of Virginia's factual

---

[11] Bell also asserts that striking the Sheldon affidavit constituted an unreasonable application of federal law based on *Napue*.  To support this contention, Bell points out that the Supreme Court in *Napue*, when responding to the argument that it was bound by a factual determination of the Illinois Supreme Court, stated that the "duty of [the Supreme] Court to make its own independent examination of the record when federal constitutional deprivations are alleged is clear, resting, as it does, on [the Supreme Court's] solemn responsibility for maintaining the Constitution inviolate."  360 U.S. at 271.  Bell asserts that this language stands for the proposition that any court reviewing a *Napue* claim has a duty to make its own independent examination of the record, and that the Supreme Court of Virginia abdicated this duty when it struck the Sheldon affidavit on hearsay grounds.  However, this argument ignores the fact that the Supreme Court of Virginia itself was the court making the "independent examination of the record."

determination that Johnson's testimony was not false was unreasonable in light of the record before the state court. To support this contention, Bell again argues that the state court should have considered the Sheldon affidavit. Bell contends that the Sheldon affidavit established that Johnson twice perjured himself. Bell further asserts that the Sheldon affidavit in conjunction with the Johnson affidavit provides overwhelming support for his Johnson *Napue* claim, making the Supreme Court of Virginia's factual finding unreasonable.

Bell admits that if the hearsay affidavit was excluded on an independent and adequate state ground, there would be a procedural bar to the evidence contained therein and this court could not consider it in assessing the reasonableness of the state court's decision. *See Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). Bell asserts, however, that the order striking the Sheldon affidavit as hearsay was not an independent and adequate state ground and in the alternative that he can establish cause and prejudice sufficient to override it. I disagree, and hold that the state court's factual determination was reasonable in light of the evidence before it.

Bell argues that the law surrounding admission of affidavits in original actions before the Supreme Court of Virginia is too confused to give rise to an adequate state ground barring federal review. In *Burket v. Angelone*, however, the Fourth Circuit clearly explained that federal courts "do not sit to review the admissibility of evidence

-25-

under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." 208 F.3d at 186. At issue in *Burket* was the Supreme Court of Virginia's order striking two affidavits on state habeas. *Id*. at 185. The Fourth Circuit explained that striking of one of the affidavits was not erroneous because it was "obviously inadmissible hearsay" and further noted that "even if the Virginia Supreme Court's evidentiary ruling was erroneous, the ruling was not so extreme as to result in the denial of a constitutionally fair proceeding." *Id*. at 186. Thus the Fourth Circuit concluded that it could not consider the stricken hearsay affidavit in its review of the claims before it. *Id*. Similarly, I find that the Supreme Court of Virginia struck the Sheldon affidavit on adequate and independent state grounds. Therefore, I cannot consider it on review of Bell's Johnson *Napue* claim absent a showing of cause and prejudice or fundamental miscarriage of justice.

Bell argues that even if the exclusion of the affidavit was an independent and adequate state ground, he can overcome the procedural bar by showing cause and prejudice. "[C]ause for a procedural default . . . ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Bell argues that Johnson's claim that he was afraid to cooperate with Bell's habeas investigator constitutes cause. Bell further contends that prejudice is established because if the Sheldon affidavit had been

considered, an evidentiary hearing on the Johnson *Napue* claim would have been warranted. I find that Johnson's unexplained "fear" does not establish the cause necessary to overcome the procedural bar to consideration of the hearsay affidavit, and thus I need not address the prejudice prong.

Without the Sheldon affidavit, the only evidence before the Supreme Court of Virginia suggesting any false testimony by Johnson was the Johnson affidavit. This affidavit stated only that detectives had reviewed newspaper articles about Bell's case with Johnson, that Johnson's interviews with the police were tape-recorded, that he was given sandwiches and cigarettes during interviews, that the prosecutor threatened him with a three-year mandatory sentence when he refused to be sworn after giving his trial testimony, and that he was afraid to cooperate with Bell's habeas investigator. The record before the state court showed that Johnson never identified any promises allegedly made to him in exchange for his testimony. As the Supreme Court of Virginia pointed out in its opinion, affidavits of police officers who interviewed Johnson stated that no consideration was promised in exchange for Johnson's testimony. The Supreme Court of Virginia further noted that Johnson did not state in his affidavit that his testimony at trial was false or that he received any consideration for his testimony. I find that the Supreme Court of Virginia's finding that the claims

of perjury with respect to Johnson were without merit is reasonable in light of the record before it.

Finally, Bell contends that even if the Supreme Court of Virginia's resolution of Bell's *Napue* claim regarding Johnson was not unreasonable and the presumption of correctness attaches under § 2254(e)(1), the new Johnson affidavit serves to overcome that presumption by clear and convincing evidence. I find that Bell failed to develop the factual basis of this claim in state court and thus the new Johnson affidavit cannot be considered on federal habeas review. In the alternative, I find that even if the information in the new Johnson affidavit is considered, Bell's claim is without merit.

Under § 2254(e)(1) a habeas petitioner can rebut the presumption of correctness that attaches to a reasonable state court decision by clear and convincing evidence, and § 2254(e)(2) dictates when a petitioner may adduce new evidence to do so. Under § 2254(e)(2), a petitioner cannot present new facts in federal court unless (1) he was diligent in developing his claim in state court or (2) he was not diligent but his claim relies on either a new rule of constitutional law made retroactive by the Supreme Court or new facts that could not have been previously discovered through the exercise of due diligence *and* the facts would be sufficient to establish, by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder

-28-

would have found the applicant guilty of the underlying offence. *Williams v. Taylor*, 529 U.S. 420, 435-36 (2000). If the petitioner can pass this hurdle, then this court can consider the new evidence.

Bell argues that because he made requests for evidentiary hearings, funding for investigators, and discovery before and during state habeas proceedings, he was diligent and can thus present the new Johnson affidavit. He also contends that his multiple meetings with Johnson establishes diligence in developing the Johnson *Napue* claim. Bell attempts to draw parallels between the efforts deemed sufficiently diligent in *Williams* and the efforts he took during the state proceedings, and suggests that his efforts actually exceed those deemed diligent in *Williams*.

*Williams* did state that "if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings" through requests for investigators and expert services denied in the state proceedings, "§ 2254(e)(2) will not bar him from developing them in federal court." *Id*. at 443. However, Bell ignores the fact that in his state habeas case he did have at least one investigator who met with Johnson several times. He had full access to Johnson, and there is nothing in the new Johnson affidavit explaining why he was unable to make the new affidavit during the state court proceedings. Therefore, I find that Bell was not diligent in developing his Johnson claim under *Williams*. Bell does not claim that he can make

the stronger showing required when diligence is not exercised, thus the new affidavit is barred by § 2254(e).

Moreover, even if Bell were diligent in developing his Johnson claim in state court and I were to consider the new Johnson affidavit, it does not establish by "clear and convincing" evidence that the decision of the Supreme Court of Virginia was unreasonable. *See* 28 U.S.C.A. § 2254 (d)(1), (e)(1). The new affidavit states that the prosecutor promised Johnson a more favorable facility and a shorter sentence to get him to testify, gave him cigarettes and other gifts during the interview, gave him reports about Bell's case to read, and promised him contact visits with his family. It also states that he initially told police he did not know what happened in Bell's case. Nonetheless, Johnson still does not claim that he lied about Bell's jailhouse confession. As to the alleged consideration for his testimony, there are affidavits from police officers stating that they never promised Johnson anything in exchange for his testimony. Furthermore, it is uncontested that Johnson was sentenced to prison before he had contact with the police regarding Bell's case, which tends to show that there could have been no promises made that would have affected his sentence. Therefore, even if I consider the new Johnson affidavit, Bell has failed to provide clear and convincing evidence that the Virginia court's finding of no perjury was unreasonable.

As a fallback position, Bell argues that even if the new Johnson affidavit does not provide clear and convincing evidence on its face, it provides sufficient evidence to warrant an evidentiary hearing. A petitioner may receive an evidentiary hearing if he: (1) alleges additional facts which, if true, would entitle him to relief and (2) satisfies one of the six factors identified in *Townsend v. Sain*, 372 U.S. 293, 313 (1963). *See Walker v. True*, 401 F.3d 574, 584 (4th Cir. 2005). Even if a petitioner can make such a showing, however, any failure to develop the factual basis of a claim in state court bars an evidentiary hearing. *Id.* (citing 28 U.S.C.A. § 2254(e)(2) and *Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002)). Because I have found that Bell failed to develop the factual basis of his Johnson *Napue* claim, an evidentiary hearing on the issue is precluded.

### 4. TIMOTHY RICE.

Bell makes a *Napue* claim regarding the search for the murder weapon, alleging that the prosecution knowingly solicited false and misleading testimony from police Lieutenant Timothy Rice about the initial search. At trial, Rice testified that the metal detectors used during the initial search on October 30, 1999, could not be used within five feet of the house because of complications caused by metal inside the home. When asked about the number of officers involved in the initial search, he claimed that he could not remember the exact number and noted that there were more than five

-31-

officers at various times. Bell argues that this testimony was false and was purposely used by the prosecution to minimize the search conducted on October 30, thereby undermining the defense theory that someone else shot Timbrook and that the real shooter planted the gun when the crime scene was left unsecured after the initial search. It is Bell's contention that the search on October 30 was actually quite thorough, and thus the gun would have been discovered if it were there at the time. Bell argues that the allegedly false testimony from Officer Rice makes the October 30 search seem less extensive than it actually was and therefore unfairly strengthens Bell's connection to the gun.

To support the argument that Rice's testimony was perjured, Bell relies on a police report written by Officer Greggs describing the October 30 search. This report states that on that day, "[u]tilizing all the manpower at the scene[,] all three properties were searched from front to back, looking for a weapon, with negative results." (Pet'r's Supp. State App., Ex. 1, at 2.) The report further states that approximately thirty police officers participated in the search. To argue that the testimony about the metal detector was false, Bell relies on an affidavit from Larry Peters, in which Peters states that there was no metal or interference at the spot the gun was found.[12] At the

---

[12] This affidavit was not presented in state court and could have been if petitioner had been diligent. Thus if the claims regarding the search for the murder weapon were not procedurally barred and I were to decide these claims on their merits, I would be barred from

-32-

end of this claim, Bell adds a claim of ineffective assistance of counsel for trial counsel's failure to effectively cross-examine Rice or call rebuttal witnesses. Because I find that the *Napue* claim regarding the search and the accompanying ineffective assistance claims were procedurally defaulted during the state court proceedings, I deny relief.

Bell did not present this claim to the Supreme Court of Virginia until January 9, 2004—ten months after he initially filed his state habeas petition—when he filed a "supplement" to his original petition, followed by a motion to supplement. The state made a motion to strike the supplement on the ground that it was untimely under section 8.01-654.1 of the Virginia Code. In its April 29, 2004, order, the Supreme Court of Virginia denied Bell's motion to supplement by saying "[t]he Court denies petitioner's . . . 'supplement to claims I and XIV in petition for writ of habeas corpus.'" *Bell II*, slip op. at 30. Bell argues that this dismissal was not in reliance on a procedural bar. He argues that if such were the case, the court would have said so. Bell further contends that if the denial had been truly based on a procedural bar, the court would have granted the state's motion to strike rather addressing the supplement directly.

---

considering this affidavit pursuant to § 2254(e)(2).

It is true that "if 'it fairly appears that the state court rested its decision primarily on federal law,' [a federal court] may reach the federal question on review unless the state court's opinion contains a 'plain statement' that [its] decision rests upon adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255, 261 (1989) (quoting *Michigan v. Long*, 463 U.S. 1032, 1042 (1983)). However, this plain statement requirement "applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision. In the rest of the cases, there is little need for a conclusive presumption [that the state court relied on federal law]." *Coleman v. Thompson*, 501 U.S. 722, 739 (1991).

There is nothing in the Supreme Court of Virginia's order denying Bell's motion to supplement that makes it "fairly appear" that the court was relying on federal law. Furthermore, the "surrounding circumstances (in particular the fact that the State had rested its argument entirely upon a procedural bar), indicated that the basis was procedural default." *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991). Therefore, I find that Bell's *Napue* claim regarding the search for the weapon and the accompanying ineffective assistance claim is procedurally defaulted.

-34-

When a state court has declined to consider the merits of a constitutional claim on the basis of an adequate and independent state procedural rule, a federal habeas court may not review the claim absent cause and prejudice. *See Harris*, 489 U.S. at 262. To demonstrate cause, the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Bell did not attempt to argue cause in the event this claim was deemed defaulted, and the record shows that cause is notably absent. Bell had access to Officer Gregg's police report throughout his trial, and thus it cannot be said that a factor "external to the defense" was responsible for state habeas counsel's failure to raise the murder weapon search issue in a timely manner. *See Swisher v. True*, 325 F.3d 225, 231 (4th Cir. 2003). Bell cannot rely on the alleged ineffectiveness of his trial counsel because "[t]he requisite ineffective assistance . . . 'is itself an independent constitutional claim' subject to the requirement of exhaustion in state court and to the doctrine of procedural default." *Id*. (quoting *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).

Furthermore, even if Bell had cause for this procedural default, he suffered no prejudice. Nothing in Officer Rice's testimony directly conflicts with Officer Gregg's report, and thus Bell's claim that this testimony was perjured is weak at best. Additionally, in view of the strong circumstantial case against Bell and the minimal

-35-

role of Rice's testimony, I cannot find that there is a reasonable likelihood that the jury would have acquitted Bell had it known that Rice's testimony was misleading or arguably false. I therefore find that Bell has failed to demonstrate prejudice to overcome the default of this claim.

## 5. JUSTIN JONES.

Bell raises a *Napue* claim that the prosecutor elicited false testimony from trial witness Justin Jones, and supports this claim with a new affidavit first filed in this court. At trial, Justin Jones testified that Bell attempted to sell him the gun later determined to be the murder weapon. In the affidavit filed with Bell's federal habeas petition, Justin Jones states that he "initially told the police, at least three times, that [he] knew nothing about the incident or the gun and [he] denied involvement in any way." (J. Jones Aff., ¶ 3, Pet'r's Supp. App., at 1.)

This claim was not presented to the state court until Bell filed the supplement to his original petition on January 9, 2004, which the Supreme Court of Virginia refused. As set forth above, I find that this ruling was based on adequate and independent state grounds and serves as a procedural bar to federal habeas review absent a showing of cause and prejudice.

Attempting to excuse the untimeliness of his Jones *Napue* claim, Bell focuses on § 2254(e)(2) and argues that he did not fail to develop the factual basis of this

-36-

claim in state court. He contends that he diligently sought resources for investigation, appointment of an additional attorney, more time for investigation, and an evidentiary hearing in state court and is thus permitted to introduce new evidence under *Williams*. Because I find that Bell raised his Jones *Napue* claim in state court and the Supreme Court of Virginia dismissed it on procedural grounds, the question of whether Bell can raise it on federal review is better analyzed under the cause-and-prejudice exception to procedural default rather than under § 2254(e)(2). *See Swisher v. True*, 325 F.3d 225, 230-31 (4th Cir. 2003) (applying cause-and-prejudice analysis to determine if petitioner could assert a claim in his federal habeas petition that the state court found defaulted). Nonetheless, this makes little practical difference given that the *Williams* diligence standard is modeled after the cause-and-prejudice standard applied to procedurally defaulted claims. *See Williams v. Taylor*, 529 U.S. 420, 433 (2000). I find that Bell's efforts fall short of both the *Williams* diligence standard and the cause-and-prejudice standard for procedurally defaulted claims and thus deny his Jones *Napue* claim.

While Bell did seek discovery and resources for more investigation during state habeas proceedings, he never suggested in his original state habeas petition that his *Napue* claim might involved the testimony of Justin Jones. Furthermore, Bell has never been denied access to Justin Jones, yet he never attempted to have his

-37-

investigators develop this claim in a timely fashion. Thus, Bell cannot show the cause necessary to excuse his default. In addition, even if I did not find that the Jones *Napue* claim was foreclosed from federal review, it appears from the record that it is without merit. Nothing in the Jones affidavit asserts that Jones committed perjury at trial, or that the prosecution knowingly presented perjury from him.

6. *BRADY* VIOLATIONS.

In *Brady v. Maryland*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The three necessary elements of a *Brady* claim are: "(1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material." *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In this context, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). The disclosure

-38-

requirement covers both impeachment material and other exculpatory evidence. *Id*. Bell claims *Brady* violations in connection with several of the state's witnesses.

### 7. TIMOTHY BERRY AND TERRY LEE JOHNSON.

Bell claims that the alleged promises made to or threats made against Johnson and Berry and the fact that Johnson initially told the police he knew nothing about Bell's case constituted *Brady* material that should have been disclosed by the state. Because I find that the state court's decision on this claim was reasonable, I deny relief.

In its order dismissing Bell's state habeas petition, the Supreme Court of Virginia held that the *Brady* claims with respect to Berry and Johnson were without merit. *Bell II*, slip op. at 2-3. Specifically, the court found that the record did not support Bell's claims that either Berry or Johnson received consideration for their testimony or were untruthful on the stand. *Id*. Based on the record before the state court as outlined above, I find this decision was reasonable. Additionally, I decline to consider the new Johnson affidavit in analyzing Bell's Johnson *Brady* claim because, as explained above, Bell failed to develop this evidence in the state court.

### 8. PATRICK SIMPSON.

In July of 2004, Bell's counsel became aware of a witness named Patrick Simpson who stated in an affidavit that he had been present on Piccadilly Street on the

-39-

night of the shooting, had seen a white man with a gun whom he believed to be the shooter, and had seen several civilians entering and leaving the crime scene. Simpson noted that he had recounted all of these observations to the police the following morning. Bell argues that the prosecution failed to disclose these statements made to the police in violation of *Brady*. Because I find this claim was procedurally defaulted in the state court proceeding and Bell cannot demonstrate cause and prejudice to overcome that default, I must deny relief.

Bell did not present this argument to the state court until he filed a motion for leave to amend the original state habeas petition on August 18, 2004, four months after the Supreme Court of Virginia had dismissed his habeas petition. The State opposed the motion on the procedural ground that Virginia state law forbids the filing of new claims after the statutory limitations period has run. *See Morrisette v. Warden*, 613 S.E.2d 551, 555 n.3 (Va. 2005). The Supreme Court of Virginia denied Bell's untimely motion in an order dated September 2, 2004. The order stated only that "the Court denies the motion," but, as discussed above, this brevity does not foreclose a finding that the ruling was based on an independent and adequate state ground. Based on the analysis set forth above, I find that the denial was indeed based on an independent and adequate state ground and thus constitutes a procedural default.

-40-

Bell again argues diligence under *Williams* to circumvent the default, and for the reasons stated above, I find that this claim is properly analyzed under the cause-and-prejudice rule applicable to procedural default. Bell contends that he was diligent throughout his trial, appeal, and collateral proceedings and that the only reason he failed to assert this claim in a timely fashion was that his multiple requests for assistance and information were denied. However, Bell did have assistance from investigators and the evidence shows that a police report containing Simpson's account of what he witnessed on the night of the murder was provided to Bell's trial counsel before trial. Thus, it cannot be said that "some objective factor external to the defense impeded counsel's efforts" to assert this claim in Bell's initial state habeas petition. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Thus, I find that Bell cannot establish cause to excuse his default and deny relief on this claim.

### 9. JASON PLUMMER AND MARLENE COMBS.

Jason Plummer and Marlene Combs both testified at Bell's trial about a conversation between the three of them in a car. In essence, the testimony of both of these witnesses was that Bell had threatened to shoot Sergeant Timbrook. After trial, Plummer declared in an affidavit that the police had threatened to charge him as an accessory to Timbrook's murder if he did not testify and that the police had put him and Combs together in a room to get their stories straight. It is Bell's contention that

-41-

these facts provided valuable impeachment evidence and the prosecution's failure to disclose such facts constituted a *Brady* violation.

This claim was not presented to the state court until Bell filed the supplement to his original petition on January 9, 2004, which the Supreme Court of Virginia dismissed without opinion. As set forth above, I find that this ruling was based on adequate and independent state grounds and serves as a procedural bar to federal habeas review absent a showing of cause and prejudice.

Bell claims that the same trial and state habeas efforts he relied upon to show diligence and cause with respect to his *Brady* claim regarding Simpson, namely the denied requests for discovery and investigatory assistance throughout his state habeas proceedings, establish diligence and cause excusing the default of his *Brady* claims regarding Plummer and Combs. I find that Bell lacks sufficient cause, however, given that Bell had investigatory help and was never denied access to Plummer. I see no reason "external to the defense" why Bell's state habeas counsel could not have obtained the affidavit from Plummer in time to present this claim to the state court in a timely fashion. *See Murray*, 477 U.S. at 488. I therefore deny relief on this claim.

### 10. TERRY, STARKS-CADET, SWARTZ, AND OTHERS.

Bell also contends that the prosecution withheld *Brady* material with respect to Aretta Terry, Rosa Starks-Cadet, Billie Joe Swartz, and other trial witnesses.

-42-

Terry testified at Bell's trial that she had disposed of bullets from Bell's car after the murder. Bell has now presented an affidavit from Terry in which she claims that the police approached her and threatened to charge her as an accessory or conspirator to the murder of Timbrook if she did not testify. She also states that her meeting with the police was recorded and that during the interrogation she told police that she had seen Bell on the night of the murder at 11 p.m. on the outskirts of Winchester returning from the Charlestown Racetrack. Bell contends that this constituted significant exculpatory evidence because the fact that Terry saw Bell returning from the racetrack at that time tends to undermine Jones' testimony that Bell attempted to sell him the murder weapon earlier that evening around 9 p.m.

Bell claims that the police withheld exculpatory evidence regarding Rosa Starks-Cadet because the police approached Starks-Cadet and promised her that if she helped the state with its investigation she would be released from jail the following day. In exchange for release from jail, a reduction in her sentence, and one hundred dollars, Starks-Cadet questioned Aretta Terry and tape-recorded the conversations. Bell contends that the prosecution's failure to disclose both the details surrounding Stark-Cadet's participation and the tape recording constituted a violation of *Brady*.

Billie Joe Swartz testified at trial that she and Bell would target shoot together and that Bell was a good shot, that Bell complained that Sergeant Timbrook harassed

him, and that Bell had threatened her when she was waiting in a holding cell to testify. Bell has submitted an affidavit from Swartz in which she states that at the time she testified she "was put in the work release program and given privileges you don't normally get in jail such as access to the washer and dryer." (Swartz Aff., ¶ 5, Pet'r's App., at 100.) Bell claims that this demonstrates a promise made in exchange for Swartz's testimony and the prosecution's failure to disclose this promise violated *Brady*.

Finally, Bell alleges *Brady* violations in connection with Dawn Jones, Rachel Wlash, and Daniel Spitler. Bell claims that both Dawn Jones and Rachel Wlash were threatened or given promises or both in exchange for testimony and that Daniel Spitler was working as a police informant at the time he witnessed the events on the night of Timbrook's murder. Bell claims that the prosecution's failure to disclose these facts to the defense violated *Brady*.

Bell had presented his claims with respect to Spitler and Wlash in his untimely supplement to the Supreme Court of Virginia on January 9, 2004, and for the reasons stated above, I find that these claims are procedurally defaulted and barred from review absent a showing of cause and prejudice or a demonstration that failure to consider the claims would result in a fundamental miscarriage of justice. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). Bell again cites his requests for discovery,

-44-

investigatory assistance, and evidentiary hearings throughout his state habeas proceedings in an attempt to excuse his failure to timely present these claims. It is Bell's contention that the prosecution withheld the exculpatory evidence relating to Spitler and Wlash and therefore Bell could not otherwise obtain this information. Even if Bell could establish cause, however, he would be unable to show prejudice.

To succeed on a *Brady* claim, one must show that suppressed exculpatory evidence was material. *Brady*, 373 U.S. at 87. Undisclosed evidence is material when its effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal quotations omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). Evidence that does not meet this threshold necessarily fails to satisfy the prejudice prong of the procedural default standard. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999). Even if Wlash was intimidated by the police and Spitler was an informant, this information is not enough to undermine their testimony, let alone undermine the entire verdict.

Bell's *Brady* claims regarding Terry, Starks-Cadet, Swartz, and Dawn Jones are all raised for the first time on federal habeas review. Under § 2254(e)(2), a petitioner cannot present a new claim for the first time on federal habeas review unless (1) he

-45-

was diligent in developing his claim in state court or (2) he was not diligent but his claim relies on either a new rule of constitutional law made retroactive by the Supreme Court or new facts that could not have been previously discovered through the exercise of due diligence *and* the facts would be sufficient to establish, by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense. *See Williams v. Taylor*, 529 U.S. 420, 435-36 (2000).[13]

Bell argues that he was diligent in developing all of these claims in state court based on his requests for discovery, investigatory assistance, and evidentiary hearings. Nonetheless, Bell had free access to all of these witnesses during the state proceedings. Indeed, both Terry and Swartz state in their affidavits that defense counsel had never tried to interview them earlier but that they would have cooperated had defense counsel done so. Furthermore, in an affidavit attached to Bell's initial petition for habeas corpus in state court, Dawn Jones stated that she felt harassed,

---

[13] This could also be viewed as a procedural default that must be analyzed under the cause-and-prejudice standard. *See Williams v. Stouffer*, No. 01-1675, 2001 U.S. Dist. LEXIS 24896, at *6-7 (D. Md. Nov. 9, 2001) (stating that "[t]o the extent that claims . . . were not presented in the state courts or preserved in petitioner's applications for leave to appeal from the denial of appellate or post conviction relief" the petitioner is procedurally defaulted from asserting such claims on federal habeas review absent a showing of cause and prejudice); *see also Gray v. Netherland*, 518 U.S. 152, 162 (1996). Nonetheless, because *Williams* itself dealt with claims raised for the first time on federal habeas review, I find that these claims are more appropriately analyzed under § 2254(e)(2). *See Williams v. Taylor*, 529 U.S. at 429.

-46-

intimidated, and pressured by the police when they approached her to testify. This shows that Bell's state habeas counsel was aware of potential police threats and promises in exchange for testimony other than those connected to Johnson and Berry, but chose not to raise them at that time. Based on this evidence, I find that Bell was not diligent in developing his *Brady* claims relating to these witnesses and thus hold that these claims are barred under § 2254(e)(2).[14]

Despite the fact that Bell never presented his *Brady* claims regarding Terry, Starks-Cadet, Swartz, and Dawn Jones to the state court, he argues that they are not foreclosed from review because of Virginia's newly created writ of actual innocence. The relevant Virginia statute provides that, "[n]otwithstanding any other provision of law or rule of court, upon a petition of a person who was convicted of a felony upon a plea of not guilty, the Court of Appeals shall have the authority to issue writs of actual innocence. . . ." Va. Code Ann. § 19.2-327.10 (Michie 2004). However, in petitioning the Virginia Court of Appeals for such a writ, a petitioner must allege, among other things, that the evidence supporting the allegation of innocence was "unknown or unavailable to the petitioner or his trial attorney of record at the time the

---

[14]   Even if I were to find that Bell had been diligent as to his *Brady* claims regarding Terry, Starks-Cadet, Swartz, and Dawn Jones, I would be compelled to deny them on the merits. The evidence of Bell's guilt at trial was strong, and, even if all of Bell's allegations regarding these witnesses were true, it cannot be said that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

conviction became final" and "that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction." Va. Code Ann. § 19.2-327.11 (Michie 2004). As explained above, Bell's trial counsel had access to these witnesses and could have interviewed them at any time, but failed to do so. Therefore, he cannot meet the standard for Virginia's writ of actual innocence.

Furthermore, in petitioning for a writ of actual innocence one must allege that "the previously unknown or unavailable evidence is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* Given the substantial amount of circumstantial evidence implicating Bell in this case, he would be unable to overcome this hurdle. Moreover, even if Bell could successfully petition for a writ of actual innocence, it is clear that the Virginia legislature did not intend that a pending or potential petition for writ of actual innocence should delay or stay postconviction proceedings in this court. *See id.* ("Nothing in this chapter shall constitute grounds . . . to delay or stay any other post-conviction appeals or petitions to any court."). Accordingly, Virginia's writ of actual innocence process does not cure Bell's failure to assert these *Brady* claims in state court, and they must be denied under § 2254(e)(2).

-48-

## B. CLAIM II—CONFLICT OF INTEREST.

Prior to witness Terry Lee Johnson's testimony, defense counsel Mark B. Williams informed the court that he had previously represented Johnson on several criminal charges. Williams explained that Bell was aware of the prior representation and that cocounsel Fischel would conduct the cross-examination to cure any potential conflict. These assurances from defense counsel satisfied the court on the potential conflict issue and it was not addressed further. Bell argues that Williams' prior representation of Johnson constituted a conflict of interest. This conflict claim is broken up into three subparts: (1) William's prior representation constituted a conflict of interest per se; (2) the trial court failed to obtain a knowing and voluntary waiver from Bell after being put on notice of the conflict; and (3) Bell's trial and appellate counsel were ineffective for failing to assert this issue at trial and on appeal.

In his state habeas proceeding, Bell filed one oversized habeas petition and one corrected habeas petition complying with the page limitations. In his oversized petition, Bell set forth a claim that his right to effective assistance of counsel was violated when the court, after being put on notice of a potential conflict, failed to obtain from Bell a knowing and voluntary waiver of William's conflict of interest. The State contends that Bell abandoned this claim in his corrected state petition and that it is thus barred from federal habeas review. Although Bell did not set this

-49-

argument forth as a separate claim for relief in his corrected petition, he did mention the waiver of conflict issue at the end of a different claim. Therefore, he did not abandon it. Nonetheless, the Supreme Court of Virginia expressly ruled in its opinion denying habeas relief that this claim was procedurally defaulted under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), because it could have been raised at trial or on direct appeal but was not so raised. *Bell II*, slip op. at 16-17. Accordingly, this aspect of Bell's conflict claim is barred from federal habeas review absent a showing of cause and prejudice. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). Because nothing "external to the defense" prevented him from raising this claim on direct appeal, Bell cannot demonstrate the requisite cause to excuse this default and I must deny this aspect of Bell's conflict claim. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Bell did not raise the conflict per se or ineffective assistance of counsel aspects of his conflict claim in state court. In essence, they are two new claims raised for the first time on federal habeas review. Under § 2254(e)(2), a petitioner cannot present a new claim for the first time on federal habeas review unless (1) he was diligent in developing his claim in state court or (2) he was not diligent but his claim relies on either a new rule of constitutional law made retroactive by the Supreme Court or new facts that could not have been previously discovered through the exercise of due

diligence *and* the facts would be sufficient to establish, by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offence. *Williams v. Taylor*, 529 U.S. 420, 435-36 (2000). Because the facts underlying his conflict per se and related ineffective assistance of counsel claims were readily available to state habeas counsel, I must deny these claims under § 2254(e)(2).

## C. CLAIM III—MENTAL RETARDATION.

In Claim III of his petition to this court, Bell asserts that he is entitled to habeas relief because he is mentally retarded and cannot be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002). In that case, the Supreme Court held that the execution of a mentally retarded defendant violates the Eight Amendment's ban on cruel and unusual punishment. Bell asserts that at a minimum the factual dispute regarding his mental retardation claim is sufficient to afford him an evidentiary hearing with this court.

In *Atkins v. Virginia*, the Supreme Court prohibited states from executing mentally retarded persons. The Court found that the cruel and unusual punishment clause of the Eighth Amendment must be read in the context of society's "'evolving standards of decency'" which are best determined by evaluating legislation enacted by state legislatures. *Id*. at 312 (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)). In reviewing the judgments of state legislatures, the Court found consistency in the

-51-

"direction of change" in that state legislation was overwhelmingly in favor of prohibiting such executions. *Id.* at 315.

In furtherance of its ruling, the Court issued a directive which placed with the states the task of defining which offenders are mentally retarded. *Id.* at 317 ("'[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'") (quoting *Ford v. Wainwright*, 477 U.S. 394, 405 (1986)). Pursuant to the Court's directive, Virginia has defined mental retardation when it is relevant to capital sentencing by statute as:

> [A] disability, originating before the age of 18 years, characterized concurrently by (I) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code Ann. § 19.2-264.3:1.1(A) (Michie 2004). The statute requires that the state Commissioner of Mental Health, Mental Retardation, and Substance Abuse Services maintain an "exclusive list of standardized measures of intellectual functioning." Va. Code Ann. § 19.2-264.3:1.1(B)(1) (Michie 2004).

A separate statute requires that a person alleging mental retardation as a bar to execution allege a "factual basis" for such a claim and grants the Supreme Court of

-52-

Virginia authority to dismiss the petition without an evidentiary hearing if it finds that it is "frivolous." Va. Code Ann. § 8.01-654.2 (Michie Supp. 2005).

Bell presented this claim to the Supreme Court of Virginia in his state habeas action, which decided the claim on the merits and found that it was frivolous. The evidence presented to the state habeas court was as follows.

Dr. William Stejskal, a psychologist, evaluated Bell before trial at the request of his defense attorneys. Dr. Stejskal performed psychological testing and administered screening instruments, including one called the Raven's Progressive Matrices ("Raven's"), to determine whether Bell suffered from cognitive impairments. The Raven's is not contained on the exclusive list of standardized measures of intellectual functioning for capital sentencing purposes maintained by the state. Bell's trial counsel elected not to present Dr. Stejskal's findings at Bell's trial. In an affidavit filed in the state habeas action, Dr. Stejskal stated that Bell's performance on the screening instruments "yielded mixed results regarding cognitive functioning" and that "additional testing is likely to provide more definitive information about Mr. Bell's level of cognitive and adaptive functioning." (Stejskal Aff. ¶ 13, Pet'r's State App., Ex. 91.)

Prior to his trial, Bell was also seen by Marie Deans, a "mitigation investigator," who reported in an affidavit filed in the state habeas case that Bell "was

-53-

extremely slow in imparting information" and "had a peculiar way of speaking that I suspected . . . was a sign of neurological damage." (Deans Aff. ¶¶ 7, 9, Pet'r's State App., Ex. 17.) Further, she reported that "[i]t was clear that something was wrong with [petitioner's] cognitive abilities." (*Id.* at ¶ 8.)

After his conviction and in connection with his state habeas action, Bell was evaluated by Dr. Greg Gelburd, a family physician, who concluded in an affidavit that Bell "has very poor cognitive functioning that clearly indicates the need for further testing to determine the extent and source of his problems." (Gelburd Aff. ¶ 18, Pet'r's State App., Ex. 8.) Dr. Gelburd reached this determination after posing a series of questions that indicated that Bell was unable to name the number of months in a year, tell time, understand the concept of opposites, perform simple addition, and was unfamiliar with Roman numerals. Bell was successful in naming his birth date and four colors in a rainbow, and reciting numbers in a series in reverse.

Bell also presented an affidavit from Dr. Alexander Morton, a psychopharmacologist with expertise in the effects of drugs on thinking and behavior. Dr. Morton stated in his affidavit that the use of alcohol and marijuana by persons under the age of sixteen is "strongly related to permanent cognitive deficits" and that "chronic use . . . by a child under the age of 10 would be expected to lead to

-54-

significant permanent cognitive deficits." (Morton Aff. ¶¶ 5-6, Pet'r's State App., Ex. 42.)

In addition to these evaluations of Bell's cognitive functioning, the record before the Supreme Court of Virginia contained information from a presentence report regarding Bell's personal history. Among other things, that report stated that

> Mr. Bell was born and raised in Jamaica. He came to the United States briefly before returning in 1992 to live. He is one of twelve children. His mother and father now live in Winchester, as do four sisters and one brother. One sister is deceased. Mr. Bell reports that no family members have felony records. . . .

> Mr. Bell has fathered five children with three different women.

> . . . .

> Mr. Bell indicates that he last attended school in 1984. He reports getting average grades. He also claims that he had no attendance or disciplinary problems. He has not attempted to get a GED.[15]

> Mr. Bell reports that he enjoys playing soccer and cricket, and attending the horse races in Charles Town, West Virginia. He admits to playing the slot machines there on occasion.

> He says he attends church on a regular basis. He in [sic] a member of the Church of Christ. A deceased sister was a deacon in the church. He claims to read his Bible daily.

> At the time of the offense, Mr. Bell says he was working part time assisting his father.

_____

[15] The report also indicated that Bell had ten years of schooling and had last attended a secondary school in Jamaica.

-55-

. . . .

> Mr. Bell claims to have no outstanding bills. He did have a car loan, but understands the car was repossessed after his incarceration. He reports that he has not received any Public Assistance.

(Pet'r's State App., Ex. 29.) The report also advised that Bell had lived with Tracy Nicholson for approximately six years and had moved out several months before the murder. Although he paid no child support, he visited their three children regularly and provided needed items. The report recited that Bell had worked for six different employers from 1993 to 1999, including employment as a fork lift operator, and had numerous disciplinary problems.

Bell also offered the affidavit of his former wife in Jamaica, Barbara Williams, that Bell's childhood nickname had been "Nattyslow" because "he is quite slow" and "had below average grade" [sic]. (B. Williams Aff. ¶ 12, 13, Pet'r's State App., Ex. 1.) A Jamaican police officer testified at trial that Bell had the nicknames of "Slow or Boisey." (VII J.A. 2841.) His aunt from Jamaica stated by affidavit, that Bell "was a little slow in his brain." (Dermod Aff. ¶ 5, Pet'r's State App., Ex. 25.)

Finally, Bell presented an affidavit from one of his trial attorneys, Jud A. Fischel, who stated that Bell had difficulty understanding the case, focusing on what was relevant, and responding with relevant and helpful information.

In opposition to the claim of mental retardation, the state submitted the grand jury testimony of a witness who described Bell's drug trafficking operation, in which Bell used a pager and a cell phone in order to be available to his customers; carefully packaged the crack cocaine so as not to disclose his fingerprints; kept his drug inventory hidden; and fronted drugs to others to sell. The state also produced documents that showed that while confined in jail Bell filed frequent written grievances, often in "eloquent" terms.[16]

The Supreme Court of Virginia issued its opinion denying Bell's habeas petition on April 29, 2004, based on the fact that Bell had "fail[ed] to present any evidence that he has performed at least two standard deviations below the mean on an IQ test" and had failed "to demonstrate that he has significant limitations in adaptive behavior." *Bell II*, slip op. at 4, 5. The court noted that

> the record demonstrates that, while petitioner's work history was varied, he was regularly employed. Although the record is not clear whether petitioner completed high school or withdrew after the tenth or eleventh grade, petitioner's own statements reveal that he maintained average grades. Petitioner lived independently and financially supported five children. He owned and drove a car, used a cell phone and pager, and read the Bible on a daily basis.

---

[16] For example, Bell complained that "the state and county officials who govern and work within this facility and operate under color of law are not granting me my due process rights." (Resp't's Mot. Dismiss Ex. 5.) Bell has filed in this court an affidavit of another inmate of the jail who claims that "[f]or most of these forms, I wrote the text of the forms, and gave them to Bell to recopy in his own handwriting." (Smith Aff. ¶ 4, Pet'r's Second Supp. Aff., Ex. 1.)

-57-

*Id.*

Thereafter, on May 28, 2004, Bell filed a petition for rehearing. On June 17, 2004, he filed a motion to supplement petition for rehearing, alleging that following the denial of the habeas petition, counsel had obtained the opinion of Dr. Richard Ruth, "a psychologist with specific expertise in mental retardation and testing immigrants for intellectual functioning." (Pet'r's Mot. Supp. Pet. Reh'g, at 1.) Dr. Ruth opined that Bell's trial psychologist "seems to have made a fundamental error" in scoring the Raven's test and that "properly calculated" Bell had a score that "would correspond to an extrapolated IQ score equivalent of 68," which is more than two standard deviations below the mean. (Ruth Aff. ¶ 8, Pet'r's Mot. Supp. Pet. Reh'g.) Dr. Ruth reported that data related to Bell's adaptive behavior, obtained from interviews with personal acquaintances of Bell, are "typical of those seen in persons with mild mental retardation." (*Id.* ¶ 9.) Further, Dr. Ruth stated that the behaviors set forth by the Supreme Court of Virginia as proof of Bell's lack of mental retardation "cannot and should not" preclude a finding of mild mental retardation. (*Id.*)

Dr. Ruth's affidavit presenting his conclusions was filed with the Supreme Court of Virginia on September 10, 2005, along with a cover letter from counsel

stating that it had been intended that the affidavit be filed with the motion to supplement.

The Supreme Court of Virginia denied the petition for rehearing by order of November 17, 2004, without further discussion of the mental retardation issue or of the motion to supplement the record.

I find that Bell is not entitled to relief based on the Supreme Court of Virginia's adjudication of this claim on the merits. To be afforded such relief, Bell must show that the Supreme Court of Virginia's decision on the merits was either contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in that proceeding. 28 U.S.C.A. § 2254(d)(1), (2). Further, I must presume that the court's determination was correct unless Bell presents clear and convincing evidence to the contrary. 28 U.S.C.A. § 2254(e)(1). I find that Bell fails to meet this burden. The Virginia statute clearly sets out a two-pronged standard under which mental retardation is defined. *See* Va. Code Ann. § 19.2-264.3:1.1. Bell fails to show that he meets either prong of the statute. He has failed to produce evidence that he has a qualifying IQ as evidenced by the result of a statutorily-accepted test, and has failed to present sufficient evidence showing the required limitations in adaptive behavior.

Thus, I find that the court's determination was reasonable, and that Bell has failed to show clear and convincing evidence to the contrary.

Bell has submitted new evidence to this court not considered by the state court. Bell has filed a second affidavit from Dr. Stejskal, the court-appointed psychologist who evaluated Bell prior to trial, in which Dr. Stejskal disagrees with the state court's legal determination of Bell's mental status. Dr. Stejskal disagrees with the court's conclusion that Bell's having owned and driven a car, owned and used a cell phone and pager, and read the Bible regularly precludes a finding that he is mentally retarded. Dr. Stejskal also states that mastery of such routine and everyday tasks is not inconsistent with a diagnosis of mild mental retardation. Further, Dr. Stejskal points to additional facts provided in the record, including Bell's childhood nicknames, his inability to maintain consistent employment, and his failure to graduate from school as evidence that Bell's intellectual capacity is significantly impaired or below average, and that evaluation for mental retardation is warranted.

Bell has also submitted an affidavit from Dr. George Harris, a forensic psychologist hired by Bell's present habeas counsel, who reported that Bell's performance on the Raven's places Bell "clearly within the range of mental retardation" and that further testing would likely produce the same result. (Harris Aff. ¶ 3, Pet'r's App., Ex 49.) Dr. Harris also criticized the state court's method of

reasoning in reaching a conclusion on Bell's adaptive behavior and functioning, indicating that attempts to measure adaptive limitations on an ad hoc basis are "neither clinically appropriate nor scientifically sound." (*Id.* at ¶ 5.)

The state argues that these affidavits, as well as that submitted by Dr. Ruth in support of Bell's petition for rehearing in state court, are foreclosed from my review.

As far as Dr. Ruth's affidavit is concerned, the state cites *Orbe v. Johnson*, 601 S.E.2d 547, 551-52 (Va. 2004), for the proposition that new matters raised for the first time in a petition for rehearing in the Supreme Court of Virginia are barred from review and thus the court's denial is based on a independent state procedural ground.

Dr. Harris's affidavit and Dr. Stejskal's second affidavit are in a different procedural posture. Unlike the Ruth affidavit, the Harris affidavit and the second Stejskal affidavit were never presented to state court but rather were presented for the first time in the petition filed with this court. In response, Bell asserts that he was amply diligent in investigating his mental retardation claim and bringing it to the attention of the court. As evidence, Bell reports that while his petition was before the Supreme Court of Virginia, he moved several times for an evidentiary hearing and for an order permitting mental health experts to be admitted with necessary equipment to the jail where Bell was being housed. Additionally, Bell requested on numerous occasions appointment of mental health clinicians for a mental retardation

-61-

determination, and leave to engage in further discovery. The Virginia court denied all of Bell's motions. After the court dismissed Bell's petition, Bell moved for rehearing, requesting again appointment of an expert and an evidentiary hearing to determine mental retardation, all of which were denied by the court. Bell asserts that because he is indigent, he was unable to procure for himself the necessary means for conducting a full evaluation for mental retardation and that in repeatedly requesting, and being denied, financial assistance, he was diligent.

However, even were I to excuse the procedural defaults urged by the state, and consider all three affidavits, the evidence is insufficient to entitle Bell to relief or even to a hearing in this court. I find that the totality of the evidence fails to support a finding that he is mentally retarded under the Virginia statute. While Bell asserts that he has scored below the required threshold on a Raven's IQ test, that test is not among those approved by the Virginia statute. *See* Va. Code Ann. § 19.2-264.3:1.1. Further, Bell has failed to present adequate evidence regarding impairment in his cognitive functioning and adaptive behavior, as is also required under the statute.

Accordingly, this claim will be denied.

### D. CLAIM IV—INEFFECTIVE ASSISTANCE OF COUNSEL.

In his fourth claim for relief, Bell contends that he was denied his Sixth Amendment right to the effective assistance of counsel during his trial and sentencing.

Specifically, Bell claims that his trial counsel were ineffective in that they (1) failed to investigate or present evidence in mitigation during sentencing, (2) failed to advise Bell that he had the right to testify during sentencing, (3) could not understand Bell due to his strong Jamaican patois and mild mental retardation, (4) failed to challenge the sufficiency of the evidence, and (5) failed to object to improper argument by the prosecution.  In order to establish an ineffective assistance of counsel claim with respect to each of these alleged failures, Bell must show both that his counsel were deficient and that the deficiency was prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Counsel is deficient if "counsel's representation fell below an objective standard of reasonableness" as measured by prevailing professional norms.  *Id*. at 688.  Except in certain limited contexts not relevant to Bell's claims in which prejudice is presumed, a deficiency is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

## 1.  MITIGATION EVIDENCE.

First, Bell claims that trial counsel were ineffective in that they failed to investigate or present evidence in mitigation during sentencing.  Bell presented this claim to the state habeas court, and the Supreme Court of Virginia found that it met neither the performance or the prejudice prong of *Strickland*.  *Bell II*, slip op. at 7-10.

-63-

Under § 2254(d), Bell is entitled to relief only if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence before the state court. *See* 28 U.S.C.A. § 2254(d)(1), (2).

It is well settled that defense counsel must conduct a reasonable investigation into a capital defendant's background prior to the penalty phase of trial, and any failure to present mitigation evidence cannot be justified as a tactical decision unless this duty to investigate has been discharged. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). Bell argues that his trial counsel's investigation into potential mitigating evidence did not meet this reasonableness test, and the evidence of record tends to support his contention.

Lloyd Snook, who was appointed as Bell's counsel after one of the originally appointed attorneys promptly withdrew, candidly asked to withdraw from Bell's case shortly before the first scheduled trial date because he had "dropp[ed] the ball" in preparing Bell's case for trial. (II J.A. at 801.) In a hearing on Snook's motion to withdraw and an accompanying motion for continuance, cocounsel Jud Fischel explained that he had "placed great faith in . . . Mr. Snook" and "just blindly thought everything was going along fine" but in reality Snook had developed "no mitigation evidence." (*Id.* at 790.) The court found that "mitigation evidence which can be

-64-

crucial . . . has not been developed," and thus granted the continuance. (*Id*. at 798-99.) Subsequently, the court granted Snook's motion to withdraw and appointed Mark D. Williams as cocounsel. (*Id*. at 815.)

Williams, who was "not on the list for capital defense attorneys" and had never before handled a capital case, was primarily responsible for preparing and presenting the defense case at sentencing. (*Id*. at 796-97; M. Williams Aff. ¶ 1, Pet'r's State App., Ex. 20.) Williams admits that "[a]fter interviewing Mr. Bell, his sisters and his mother [he] concluded that there was little evidence that would assist in mitigating the case against Mr. Bell." (M. Williams Aff. ¶ 7, Pet'r's State App., Ex. 20.) Williams further conceded that he "did not request any documents regarding Mr. Bell, such as education, medical or employment records, and [he] did not seek such information through interviews." (*Id*. at ¶ 8.)

Marie Deans, a mitigation investigator hired to work on Bell's case, provides further evidence of deficiencies in defense counsel's investigation. Deans was appointed to Bell's case in February of 2000, and shortly thereafter interviewed Bell. ( Deans Aff. ¶¶ 5-6, Pet'r's State App., Ex. 17.) Deans noted that "it was clear that something was wrong with [Bell's] cognitive abilities" and suspected some "neurological damage." (*Id*. at ¶¶ 8-9.) Deans told Snook of these findings and asked him "many times to [give to her] phone numbers and addresses for Mr. Bell's family

-65-

so that she could begin [her] investigation," but Snook never responded. (*Id.* at ¶¶ 10-12.) Sometime later, Deans received a letter from Fischel's office requesting her contact information and she "called back providing it," but she never heard from Bell's defense counsel again. (*Id.* at ¶14.) Deans has "worked on over 200 capital cases as a mitigation investigator," and noted that "[r]egarding trial counsel and the mitigation investigation, this was the most disorganized case that [she has] ever attempted to work on." (*Id.* at ¶¶ 1, 15.)

Bell argues that had his trial counsel investigated his criminal history, they would have found that he had no prior incarcerations and that all of his prior convictions were essentially non-violent. Namely, they included several misdemeanors, a conviction for concealing a gun that he was otherwise lawfully permitted to carry, and one minor assault conviction in Jamaica where he tore another man's shirt. Bell further argues that had defense counsel properly investigated his background, they would have found that Bell had witnessed a number of traumatic violent events in Jamaica; he was known as "Slow"; he did not graduate from high school; and he had difficulties remaining employed. Affidavits from Bell's aunt and ex-wife that were presented to state habeas counsel provide evidence of Bell's mental limitations. (Dermod Aff. ¶¶ 3, 5; B. Williams Aff. ¶¶ 8, 9, 10, 12-14, Pet'r's State App., Ex. 25, Ex. 1.) The affidavit from Bell's ex-wife further states that she was

-66-

never interviewed by Bell's trial counsel, but she would have testified that Bell was a loving and caring father who had an excellent relationship with his daughter. (B. Williams Aff. ¶¶ 4-5, 11, Pet'r's State App., Ex. 1.)

Tracy Nicholson, the mother of three of Bell's children, stated in an affidavit presented to the state habeas court that Bell's trial counsel interviewed her twice "but only to help them with little stuff, like how to find witnesses." (T. Nicholson Aff. ¶ 2, Pet'r's State App., Ex. 2.) She further noted that Bell was a loving father, that he worked a full-time job to support his children, and that he had never been violent with either her or the children. (*Id.*) Similarly, Joanne Nicholson, the grandmother of three of Bell's children, stated in an affidavit that Bell had lived with her for over two years, that Bell was never violent with Tracy, and that he had a loving relationship with his family. (J. Nicholson Aff. ¶ 2, Pet'r's State App., Ex. 3.) The testimony of both Tracy and Joanne Nicholson could also have rebutted the testimony of Billie Joe Swartz. (*Id.*; T. Nicholson Aff. ¶ 2, Pet'r's State App., Ex. 3.) Dawn Jones, Bell's girlfriend when he first arrived in the United States and mother of one of his daughters, also stated in an affidavit that Bell was a loving and affectionate father, and noted that Bell had sat by his premature daughter's bedside for days after she was born. (D. Jones Aff. ¶¶ 3, 4, 11, Pet'r's State App., Ex. 4.) Dawn Jones was never interviewed by Bell's trial counsel. (*Id.* ¶ 7.) In addition to all of these affidavits

-67-

averring that Bell was a good father, Bell also notes that his trial counsel could have proven his loving relationship with his children directly to the jury by either calling the children as witnesses or introducing the many cards his children sent to him while he was incarcerated.

Despite all of this potential mitigation evidence,[17] the mitigation case put forth by Bell's trial counsel consisted of only two witnesses, Bell's sister and father, who testified collectively for less than seven pages of transcript. The Supreme Court of Virginia found that "counsel introduced evidence of [Bell's] background and family life and such evidence was heard by the jury through [Bell's] sister and father," *Bell II*, slip op. at 8, but the sentencing phase transcript shows that the testimony of these two witnesses did not focus on Bell. Trial counsel did not ask Bell's sister or father a single question about Bell's background, his relationships with his family, his children, or any other potentially mitigating factors. (VII J.A. at 2910-16.) In closing argument, the prosecutor noted that Bell had not "produced one shred of evidence of mitigation," and continued that "[t]here has been no evidence presented by the

---

[17]    In addition to the evidence set forth above, Bell also presented for the first time in his federal habeas petition two new affidavits from Terry and Starks-Cadet as well as a letter from Enos Davenport, one of Bell's fellow inmates, setting forth more potential mitigation evidence in support of his claim. The state argues that this newly-presented evidence is foreclosed from federal habeas review under § 2254(e)(2). Because I find that this new evidence is not critical to my decision on this claim, I need not address the state's argument.

-68-

Defense, or though any other witness in this case in mitigation." (VII J.A. at 2925, 2927.) Moreover, defense counsel stated in closing argument that "[t]he testimony that was offered was very graphic about a violent man. We didn't rebut it. Not try to defend it, refute it. We didn't." (VII J.A. at 2930.)

The Supreme Court of Virginia found, and the state now argues, that defense counsel's failure to present the potentially mitigating evidence set forth by Bell was a strategic decision. *Bell II*, slip op. at 8-10. However, this overlooks the fact that defense counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000). It is true that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste," but Bell presents evidence that defense counsel Williams abandoned his investigatory efforts without such justification. *Rompilla v. Beard*, 125 S. Ct. 2456, 2463 (2005). If trial counsel indeed failed to make a reasonable investigation, then an informed tactical decision would be rendered impossible. *See Wiggins*, 539 U.S. at 522. Furthermore, contrary to the Supreme Court of Virginia's findings, it is far from clear that the potential mitigation evidence proffered by Bell was the type of double-edged evidence that courts have found reasonable to exclude from mitigation cases.

Therefore, in light of Bell's properly supported allegations of weakness in defense counsel's investigation and availability of potential mitigation evidence, I find Bell has presented a colorable claim that the Supreme Court of Virginia's decision denying this claim was an unreasonable determination of the facts in light of the evidence before it and an unreasonable application of the *Strickland*, *Williams*, *Wiggins*, and *Rompilla* line of Supreme Court precedent. *See* § 2254(d). However, I will refrain from making a final ruling on this issue until an evidentiary hearing is held and the relevant issues are developed more fully. Because Bell diligently developed the factual basis of this claim in state court, an evidentiary hearing is not barred by § 2254(e)(2). Bell's allegations of trial counsel's insufficient investigation and overlooked mitigation evidence constitute "facts that, if true, would entitle him to relief," *McCarver v. Lee*, 221 F.3d 583, 598 (4th Cir. 2000), and it appears from the record that "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." *Townsend v. Sain*, 372 U.S. 293, 313 (1963). Thus, I find that Bell is entitled to a hearing on this claim. *See Fullwood v. Lee*, 290 F.3d 663, 681 (4th Cir. 2002).

## 2. RIGHT TO TESTIFY.

Next, Bell claims that his trial counsel were ineffective in failing to inform Bell that he had a right to testify during the penalty phase. Bell contends that if he had

been informed of his right to testify, he would have told the jury about his relationship with his children and expressed sympathy for Timbrook's family. Bell presented this claim in his state habeas petition, and the state court found that it was without merit. Specifically, the Supreme Court of Virginia found that Bell was aware of his right to testify at the trial's sentencing phase and that the claim therefore satisfied "neither the 'performance' nor the 'prejudice' prong of the two-part test enunciated in *Strickland*." *Bell II*, slip op. at 10. Bell is thus entitled to habeas relief only if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C.A. § 2254(d)(1), (2).

It is well established that a criminal defendant has a constitutional right to testify on his own behalf, and trial counsel's responsibility to inform the defendant of this right is a component of effective assistance. *See Daniels v. Lee*, 316 F.3d 477, 490, 491 (4th Cir. 2003). However, the Supreme Court of Virginia specifically found that Bell was aware of his right to testify at the trial's sentencing phase, and Bell has failed to present any clear and convincing evidence to rebut the presumption of correctness afforded to this factual finding under § 2254(e)(1). Therefore, his claim

that his lawyers were ineffective in failing to inform him of his right to testify must fail under *Strickland*.  *See Daniels*, 316 F.3d at 491.

In his state habeas case, Bell presented the affidavits of his two trial attorneys. Admittedly, one attorney noted that he could not specifically recall whether he informed Bell of his right to testify during the sentencing phase.  However, the other attorney stated that, although he did not advise Bell on his right to testify at the punishment phase of trial, he did tell Bell before trial that he could testify. Furthermore, the record demonstrates that Bell was present both when his attorneys questioned the prospective jurors about Bell's right to testify and when his attorneys argued to the trial court that Bell might testify during the sentencing phase.  Based on this evidence, the state habeas court found that Bell was aware of his right to testify during the entire trial, and that he had waived that right.  Therefore, the state habeas court concluded that Bell failed to demonstrate deficient performance on the part of his counsel and failed to show any prejudice resulting from the alleged error.

In assessing the reasonableness of the Supreme Court of Virginia's decision on this claim, I find that *Daniels* is controlling.  The petitioner in *Daniels* claimed that he was unaware of his right to testify at sentencing and that his lawyers were ineffective in failing to make him aware of this right.  *Daniels*, 316 F.3d at 490. Affidavits from Daniels' attorneys stated that they advised Daniels of his right to

testify during the guilt phase of the trial but could not recall advising Daniels of his right to testify in the sentencing phase. *Id.* The record in *Daniels* also reflected that Daniels was present during the voir dire proceedings when his attorneys questioned prospective jurors about Daniels' right to testify and that Daniels had at one time expressed a desire to testify during the guilt phase of his trial. *Id.* Furthermore, Daniels was present at the outset of sentencing when the trial court advised that Daniels' leg irons would not be displayed in the presence of the jury if Daniels decided to testify. *Id.* at 490-91.

The North Carolina equivalent of a state habeas court relied on this evidence in finding that Daniels was indeed aware of his right to testify during the entire trial and that he had waived that right. *Id.* at 491. On federal habeas review, Daniels did not provide the district court with any evidence to rebut the state court's findings other than an after-the-fact denial of any awareness of his right to testify; therefore, the Fourth Circuit found that Daniels failed to offer any clear and convincing evidence to displace the state court's finding that Daniels was aware of his right to testify in the trial's sentencing phase. *Id.* Accordingly, the Fourth Circuit held that Daniels' "contention that his lawyers were ineffective in failing to inform him of his right to testify must fail." *Id.*

-73-

Bell's case cannot be distinguished from *Daniels* in any meaningful way. The evidence relied on by the Supreme Court of Virginia in finding that Bell was aware of his right to testify at the sentencing phase is analogous to that relied on by the state court in *Daniels*. Although Bell did present evidence to this court regarding his alleged difficulty in understanding English, which is slightly more than the "general after-the-fact denials" of the awareness of the right to testify that were submitted to the district court in *Daniels*, I nonetheless find that it does not amount to the "clear and convincing evidence" necessary to overcome the presumption of correctness afforded the state court findings. *See* 28 U.S.C.A. § 2254(e)(1). Accordingly, I also find that the Supreme Court of Virginia's conclusion that Bell's right-to-testify claim satisfied neither the performance nor the prejudice prong of *Strickland* was not unreasonable under § 2254(d) and deny relief.

### 3. FAILURE TO UNDERSTAND BELL.

Bell did not present his next claim, that trial counsel were ineffective due to an alleged failure to understand Bell, to the Supreme Court of Virginia; therefore, I find that it is barred from federal habeas review. Indeed, the petitioner concedes that this claim is procedurally defaulted in his brief in opposition to the state's motion to dismiss the federal habeas petition. It cannot be said that Bell's state habeas counsel was diligent in developing this claim, given that Bell's thick Jamaican patois and

-74-

intellectual infirmities have existed throughout Bell's trial, appeal, and post-conviction proceedings, and given that these problems would have been readily discernable to Bell's state habeas counsel. It is also clear that Bell cannot make the more stringent showing necessary when a petitioner has failed to develop his claim. Thus, this claim is defaulted.

### 4. SUFFICIENCY OF THE EVIDENCE.

In his next allegation of ineffective assistance, Bell contends that trial counsel were deficient in failing to challenge the sufficiency of the evidence against him during the guilt phase of his trial. Specifically, Bell argues that trial counsel should have argued that the evidence did not establish that Bell knew, as is required in order to be convicted of capital murder, that Timbrook was a law enforcement officer and that Bell killed Timbrook in order to interfere with his official duties. *See* Va. Code Ann. § 18.2-31(6). Bell further argues that trial counsel were ineffective in failing to present evidence that, because Bell allegedly could not have recognized Timbrook, the shooting was not premeditated. Bell presented this claim in his state habeas proceeding, and the Supreme Court of Virginia found that it failed both the performance and the prejudice prong of the two-part test set forth in *Strickland. Bell II*, slip op. at 28-29. Because the state court adjudicated this claim on the merits, Bell

is entitled to relief only if he satisfies the conditions set forth in 28 U.S.C.A. § 2254(d).

The Supreme Court of Virginia correctly identified *Strickland* as the law governing ineffective assistance of counsel claims, thus I must now decide whether its application of *Strickland* to Bell's claim regarding trial counsel's alleged failure to object to the sufficiency of the evidence was unreasonable. In order to constitute an unreasonable application of *Strickland*, the state court's determination on this claim must have been more than incorrect or erroneous; it must have been objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 409).

Eyewitness testimony at trial refuted the contention that Bell did not know that Timbrook was a police officer. Brad Triplett testified that he heard Timbrook shout "stop running, police!" at least twice while chasing Bell. (V J.A. at 1908.) A neighbor also testified that he heard Timbrook say "stop, police" as Timbrook and Bell ran by the neighbor's porch. (V J.A. at 1963.) Given this credible evidence indicating that Bell did know Timbrook was a police officer, it does not seem objectively unreasonable for Bell's trial counsel to refrain from arguing to the contrary. Furthermore, as the Supreme Court of Virginia noted in its opinion, the crux of the defense theory was that Bell was not the shooter. In light of this defense

-76-

strategy, it would have been unwise for trial counsel to have argued to the jury in the alternative that, if they found that Bell had shot Timbrook, he had done it without premeditation. Therefore, I find that the Supreme Court of Virginia's decision that Bell's trial counsel was not deficient in this regard was reasonable, and I must deny habeas relief on this ineffective assistance claim.

## 5. CLOSING ARGUMENTS.

Lastly, in a footnote, Bell claims that his trial counsel were also ineffective in that they failed to object to an allegedly improper closing argument made by the prosecution during the sentencing phase.[18] In pertinent part, the prosecutor stated:

> This is not an individual, ladies and gentlemen, who has produced one shred of evidence of mitigation.
>
> . . . .
>
> . . . There is no mitigation evidence in this case, ladies and gentlemen. There is no mitigation evidence in this case. There has been no evidence presented by the Defense, or through any other witness in this case in mitigation.

---

[18]  In his initial habeas petition filed on May 17, 2005, Bell also alleged that trial counsel were inefficient in failing to make several other objections. Specifically, Bell claimed trial counsel were deficient in failing to challenge the connection between the bullet and the gun; failing to object to evidence of the alleged relationship between Timbrook and Bell; failing to object to the prosecution's argument that Bell was singing along to a rap song; and failing to object to the prosecution's improper bolstering of witnesses and improper suggestion that Bell carried the burden of proof to avoid the death penalty. (Original Pet. at 114-15.) Because Bell did not raise these alleged deficiencies in his amended petition, these claims of ineffective assistance have been withdrawn and are no longer before the court.

. . . .

> . . . There is not one shred of evidence in this case in mitigation. If there were, I would point it out to you, because that is my duty as well, as a member of the Bar. It is not here, ladies and gentlemen. It is not here.

(VII J.A. at 2925, 2927, 2938.) Bell claims that this argument constituted impermissible vouching and that it contained a false statement of law.

Bell presented this claim in his state habeas petition, and the Supreme Court of Virginia found that Bell's trial counsel was not ineffective under *Strickland* because "the trial court made it clear to the jury that counsel's closing argument was not evidence." *Bell II*, slip op. at 30. Because I find that the state court's adjudication of this claim was not unreasonable under § 2254(d), I must deny relief.

It is true that a prosecutor's improper closing argument may constitute a denial of due process if it renders the proceeding "fundamentally unfair." *Bennett v. Angelone*, 92 F.3d 1336, 1345 (4th Cir. 1996) (internal quotations omitted). Furthermore, a defense counsel's failure to object to such prosecutorial misconduct can amount to ineffective assistance of counsel under *Strickland*. However, in the instant case, the challenged argument did not violate due process, and thus trial counsel were not deficient under *Strickland* for failing to object.

In order for a defendant's due process rights to be violated by a prosecutor's closing argument, the prosecutor's remarks must (1) be improper and (2) "so

-78-

prejudice[] the defendant's substantial rights that the defendant [is] denied a fair trial." *United States v. Morsley*, 64 F.3d 907, 913 (4th Cir. 1995).   Arguments typically deemed improper involve situations in which a prosecutor "express[es] his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant," "intentionally [] misstate[s] the evidence or mislead[s] the jury as to the inferences it may draw," or makes an argument "calculated to appeal  to the prejudices of the jury."   ABA Standards for Criminal Justice 3-5.8 (3d ed. 1993) (second edition cited with approval by the Supreme Court in *United States v. Young*, 470 U.S. 1, 8 (1985)).   Although "[t]he line separating acceptable from improper advocacy is not easily drawn," it is clear that the prosecutor's argument in this case was within acceptable bounds.  *Young*, 470 U.S. at 7.

Here, the prosecutor merely commented on the dearth of mitigation evidence presented by the defense during the sentencing phase in Bell's trial.   Indeed, Bell's primary argument for the ineffective assistance of counsel is that trial counsel failed to investigate and present mitigation evidence.  Petitioner concedes that "the evidence presented in so-called 'mitigation' at sentencing was not even connected to Bell himself."  (Pet. at 117.)   Therefore, the challenged argument was not improper, and Bell's trial counsel were not deficient for failing to object.   Moreover, the ultimate question is not whether the prosecutor's argument was actually improper. *See Bennett*

*v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996). Because "refraining from objecting to avoid irritating the jury is a standard trial tactic," I find that trial counsel in the instant case would not be deficient under *Strickland* in any event. *Id*.

Furthermore, even if this argument was improper, Bell did not suffer any prejudice as a result. The prosecutor's comments did not "so infect[] the [proceeding] with unfairness as to make the resulting [sentence] a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Supreme Court of Virginia found that "the trial court made it clear to the jury that counsel's closing argument was not evidence," and thus any risk of undue prejudice was minimized and petitioner's ineffective assistance claim relating to the closing argument must fail. *Bell II*, slip op. at 30.

## E. CLAIM V—FUTURE DANGEROUSNESS.

Bell claims that the jury's assessment of future dangerousness violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and thus entitles him to habeas relief from this court. Bell cites five separate reasons why the jury's assessment regarding future dangerousness was flawed. I review each in turn.

### 1. PRISON CONDITIONS EXPERT.

First, Bell asserts that the trial court denied him the right to put on evidence at sentencing from a prison expert on prison security and conditions, and thereby

-80-

violated clearly established Supreme Court precedent and disabled Bell from proving that his imprisonment for life in a "super-max" facility would create no future danger to society. Bell had secured an expert, James E. Aiken, a penologist and prison administrator, and sought to introduce his testimony for the purpose of rebutting the state's evidence of Bell's future dangerousness. The trial court excluded Aiken's testimony as irrelevant to mitigation.

Bell raised this issue in his direct appeal to the Supreme Court of Virginia, which found that the evidence Bell sought to introduce was of the same kind deemed not relevant to the future dangerousness inquiry in *Burns v. Commonwealth*, 541 S.E.2d 872 (Va. 2001), and *Cherrix v. Commonwealth*, 513 S.E.2d 642 (Va. 1999), because it was not specific to Bell's character or history, or the circumstances of the offense. *Bell I*, 563 S.E.2d at 714. In *Cherrix*, the defendant sought to present evidence on prison life and its effect on his future dangerousness through testimony by various experts. *Cherrix*, 513 S.E.2d at 653. The trial court determined that the evidence proffered by the defendant was immaterial to mitigation. *Id*. The defendant argued to the Supreme Court of Virginia that exclusion of the proffered expert testimony was a violation of the Virginia law allowing presentation of mitigating evidence, and a violation of the constitutional right to mitigation evidence. The Supreme Court of Virginia disagreed, finding that the defendant's right to present

-81-

mitigating evidence does not limit the court's authority to exclude as irrelevant evidence not bearing on the defendant's character, prior record, or circumstances of the offense. *Id.*; *see also Lockett v. Ohio*, 438 U.S. 586, 605 n.12 (1978). The court further found that Cherrix sought to introduce evidence involving "the general nature of prison life," rather than evidence concerning history and experience particular to the defendant. *Cherrix*, 513 S.E.2d at 653. Because the evidence was not specific to the defendant, but rather reached prison conditions generally, the court found that the trial court had properly excluded it. *Id.*

In *Burns*, the defendant, recognizing that general prison life evidence had been deemed in *Cherrix* immaterial to mitigation, proffered the same evidence, but for the purpose of rebutting the state's future dangerousness claim. The defendant argued that prison life evidence is material, as prison is the only society to which a capital defendant can pose a "continuing serious threat," and therefore he should be permitted to demonstrate that the threat of criminal acts in the future is severely limited in a maximum security prison. *Burns,* 541 S.E.2d at 893. The court disagreed, reiterating its holding in *Cherrix* that the right to present mitigation evidence does not limit the court's authority to exclude evidence which is immaterial or irrelevant, and holding that the relevant inquiry is not whether the defendant "*could* commit criminal acts of violence in the future, but whether he *would*." *Id.* It determined that evidence

-82-

regarding the general nature of prison life was not relevant to the particular facts of the defendant's history and background and the circumstances of his offense, even when offered in rebuttal to evidence of future dangerousness.  *Id.*

Because this issue was adjudicated on the merits in state court, pursuant to § 2254(d) I may grant relief on Bell's claims only if he shows either that the state court adjudication resulted in a decision that was contrary to or involved an unreasonable application of federal law, as determined by the United States Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  I find that Bell meets neither standard, that the Supreme Court of Virginia's adjudication was reasonable, and that I must deny relief.

First, Bell asserts that Virginia's case law on prison conditions evidence is contrary to clearly established federal law, namely *Skipper v. South Carolina*, 476 U.S. 1 (1986).  Bell is correct in asserting that Supreme Court precedent establishes for capital defendants a right to present mitigating evidence relating to their character, record, or offense to the sentencing body.  *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).  While Bell characterizes this right as "broad," the Supreme Court has limited permissible mitigation evidence to that which is relevant and related to "a defendant's

-83-

character or record and any . . . circumstances of the offense." *Lockett v. Ohio*, 438

U.S. 586, 605 (1978); *see Eddings,* 455 U.S. at 110.

In *Skipper v. South Carolina*, the Supreme Court found a violation of the right

to present mitigation evidence where the state court excluded testimony by two jailers

and one "regular visitor" that the defendant had made a "good adjustment" to life in

jail during his seven months of incarceration.  476 U.S. at 6.  The Court found that

such testimony would be "mitigating" in serving as a basis for a sentence less than

death, and reasoned that excluding such evidence violated the defendant's right to

place mitigating evidence before the sentencer. *Id*. at 5.  Further, the Court in *Skipper*

limited its ruling, explicitly stating that it does "not hold that all facets of the

defendant's ability to adjust to prison life must be treated as relevant and potentially

mitigating." *Id*. at 7 n.2.

Bell asserts that the Supreme Court of Virginia's application of *Cherrix* and

*Burns* to his case violates the rule set out in *Skipper*.  I disagree, and find that

Virginia's rules regarding general prison life evidence fit within the framework

established by the cases setting out a defendant's right to present mitigation evidence.

*Eddings* and *Lockett* permit introduction of mitigation evidence particular to the

defendant and his future adaptability.  The Court granted relief in *Skipper* because the

evidence excluded by the trial court was particular to the defendant and his adjustment

-84-

to incarceration and was therefore within his constitutional rights to present. The evidence proffered by Bell, conversely, is general evidence related to prison conditions and deals with whether he *could* engage in violent acts while incarcerated. Thus, it falls outside the categories of character, history, or circumstances of the offense. Further, Bell mischaracterizes the Virginia rule, asserting that it "abandoned" the inquiry into actual future dangerousness. On the contrary, the Virginia rule encourages the introduction of such evidence, so long as it deals particularly with the defendant, as required by *Eddings* and *Lockett*. Accordingly, I find that the Supreme Court of Virginia's decision is not contrary to *Skipper v. South Carolina* and that relief would be improper on this claim.

Next, Bell asserts that the Supreme Court of Virginia's application of the rule against prison life evidence in his case violated his right to necessary expert services. Bell asserts that he had a right to rebut the state's evidence of his future dangerousness, and after making a threshold showing was entitled to the assistance of an expert.

Bell correctly asserts that the Supreme Court has recognized that the state, upon request, must provide indigent defendants with "the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). It is undisputed that fundamental fairness

-85-

requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612 (1974). The Supreme Court has also held that one of the basic tools is a due process right to the appointment of a psychiatrist to assist a defendant when he demonstrates that his sanity at the time of the offense will be a significant factor at trial. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

The law of this circuit, however, does not extend the holding in *Ake* to require appointment of experts for purposes other than a determination of sanity. *See Weeks v. Angelone*, 176 F.3d 249, 265 (1999), *aff'd on other grounds*, 528 U.S. 225, *reh'g denied*, 529 U.S. 1013 (mem.) (2000). To apply such a new rule here would violate the prohibition in *Teague v. Lane*, 489 U.S. 288, 311-12 (1989) (plurality opinion) against announcing new rules on collateral review.[19] Because the Fourth Circuit has not recognized the extension of *Ake* to other types of experts, and because *Teague* precludes my announcing a new rule on this issue, I must deny Bell's request for relief on this claim.

---

[19] In *Teague*, the Supreme Court held in a plurality opinion that new rules will not be announced on collateral review unless they fall into one of two exceptions, neither of which apply here. See 489 U.S. at 311-12.

-86-

## 2. AGGRAVATING FACTORS.

Next, Bell alleges that his death sentence violates the federal Constitution because the indictment failed to include the capital offense aggravating factors. Bell separately contends that his counsel's failure to raise this issue at trial and on direct appeal amounted to ineffective assistance of counsel.

As to Bell's substantive claim, he asserts that the indictment's lack of aggravating factors precludes his sentence of death based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).

In *Apprendi*, the Supreme Court held that any fact other than the fact of a prior conviction that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. 530 U.S. at 490.

*Ring* involved an Arizona statutory sentencing scheme whereby a death sentence was legally imposed only if at least one aggravating factor was found to exist beyond a reasonable doubt. 536 U.S. at 597. In the same statutory scheme, the aggravating factors were determined by a judge rather than a jury. *Id*. at 592. The issue decided in *Ring* was whether the judge-made determination was valid, or whether the Sixth Amendment right-to-trial guarantee as applied to the states by the Fourteenth Amendment required that the aggravating factor be found instead by a jury. *Id*. at 597. Citing *Apprendi*, the Court found that because the aggravating

-87-

factors operated as the functional equivalent of an element of a greater offense, the Sixth Amendment required a jury finding as to that element. *Id*. at 609.

Though *Ring* and *Apprendi* relate to jury trial guarantees, subsequent case law has extended their holdings to require that in the context of federal prosecutions the indictment must include all issues to be determined by a jury. *See United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003). Bell appears to argue that there is a federal constitutional right requiring state capital indictments to include aggravating factors and that because his charging indictment failed to allege future dangerousness or any other aggravating factors, he is entitled to habeas relief.

Bell presented this claim to the Supreme Court of Virginia on state habeas review. That court held the substantive claim to be procedurally defaulted because the issue was neither raised at trial nor on direct appeal. *Bell II*, slip op. at 21. The court found that it was not a cognizable claim on a petition for habeas corpus, citing *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), which prohibits state habeas review of claims that were available to the petitioner at trial or on direct appeal but were not raised at that time.

In *Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998), the Fourth Circuit held that a federal habeas court may not question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable

-88-

so long as it was based upon an adequate and independent state law ground. In this case, the Supreme Court of Virginia's application of *Slayton*'s procedural default rule provides an adequate and independent state law ground upon which to deny relief on federal habeas review, barring cause and actual prejudice or a miscarriage of justice. *See Mu'Min v. Pruett*, 125 F.3d 192, 196-97 (4th Cir. 1997) (rejecting petitioner's argument that procedural default rule in *Slayton* does not bar consideration of claims because rule is not independent of federal law).

To show cause, the petitioner must demonstrate some objective factor external to his defense that impeded counsel's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate prejudice, a defendant must show not merely that there was a possibility of prejudice, but that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional magnitude. *Id*. at 494. Here, because I find that Bell fails to produce adequate justification for the assertion that he was prejudiced by failing to raise this claim, I will not reach his arguments regarding cause.[20]

---

[20] Bell appears to argue that because *Ring* was decided after his trial and direct appeal, that the legal basis for his argument was not available. While this may be the case, a defendant must show both cause and prejudice to succeed on his petition for relief. *See Murray*, 477 U.S. at 494-95. Bell is unable to do so.

-89-

The Virginia statutory sentencing scheme does not contain infirmities parallel to those in the Arizona statutes as found by the Supreme Court in *Apprendi* and *Ring*. In Virginia, if the defendant elects a jury trial, as Bell did here, the existence of an aggravating factor, here, future dangerousness, is submitted to a jury in conformity with Sixth Amendment guarantees. Bell, however, asserts that the indictment in his case was defective for failure to set out the aggravating factors upon which the state would seek the death penalty. However, states are not currently bound by the federal Constitution to proceed in felony cases by way of indictment. *See Muhammad v. Commonwealth*, 619 S.E.2d 16, 39 (Va. 2005). Even if Bell had raised this claim at trial and on direct appeal, he has no meritorious constitutional claim regarding the state's failure to include the aggravating factor in the capital murder indictment because proceeding by indictment is not constitutionally required of the states. *See id.*

Further, as the Supreme Court of Virginia noted in denying relief in Bell's state habeas petition, Virginia law provides that if the indictment gives a defendant notice of the nature and character of the offense charged sufficient to make his defense, no bill of particulars is required. *Roach v. Commonwealth*, 468 S.E.2d 98, 107 (Va. 1996), *overruled on other grounds by Morrisette v. Warden*, 613 S.E.2d 551 (Va. 2005). In fact, the Supreme Court of Virginia has held that an indictment reciting an

Case 7:04-cv-00752-JPJ   Document 92   Filed 02/07/06   Page 90 of 162   Pageid#: 1746

offense under Va. Code Ann. section 18.2-31, as did Bell's, was sufficient to place the defendant on notice of the nature and character of the offense. *Goins v. Commonwealth*, 470 S.E.2d 114, 123 (Va. 1996), *abrogated on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000). Therefore, Bell was given adequate notice under Virginia law.

Because it is clear that Bell suffered no prejudice by not having raised the substantive *Apprendi*/*Ring* claim at trial or on direct appeal, I find that his claim is procedurally defaulted in this court. Accordingly, I deny relief.

Bell asserts separately that his counsel were ineffective in failing to raise the *Apprendi* and *Ring* issues at trial or on direct appeal. On state habeas review, the Supreme Court of Virginia held that Bell's claim met neither the "performance" nor the "prejudice" prong of the *Strickland* test. *Bell II*, slip op. at 21-22; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). It reasoned first that because *Ring* and *Apprendi* have been held not to apply to the states through the Fourteenth Amendment, raising those claims would have proved fruitless and thus not prejudicial under *Strickland*. Further, the court referred to its previous holding that capital defendants are not entitled to bills of particulars setting out the intended aggravating factors when the indictment specifying the crime gave the defendant specific notice of the nature and character of the offense. *Roach*, 468 S.E.2d at 107.

-91-

As previously explained, the Sixth Amendment guarantees the effective assistance of counsel. In order to establish an ineffective assistance of counsel claim, Bell must show both that his counsel were deficient and that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is deficient if "counsel's representation fell below an objective standard of reasonableness" as measured by prevailing professional norms. *Id*. at 688. Except in certain limited contexts not relevant to Bell's claims in which prejudice is presumed, a deficiency is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

For the reasons stated above, there is no reasonable probability that raising an *Apprendi*/*Ring* claim at trial or on direct appeal would have changed the outcome of the proceeding, because that claim would have been found not meritorious under existing Virginia law. Thus, Bell fails to show the prejudice prong under *Strickland*. Accordingly, I must deny habeas relief.

### 3. JURY QUESTION ON EARLY RELEASE.

Bell next argues that he is entitled to habeas relief because the state court acted contrary to or unreasonably applied clearly established federal law in responding to a jury question regarding whether, other than parole, there was any other way in which the defendant could be released from a life sentence. Bell alleges that the trial court's

-92-

response violated his due process rights pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994).

At Bell's trial, during penalty phase deliberations, the jury inquired, "[u]nderstanding that imprisonment for life means no possibility of parole, is there any other way to be released from prison?" (VII J.A at 2951.) The court's first proposed answer to the jury was, "No. Not when the Defendant has been convicted of capital murder." (*Id*. at 2952.) The state objected to the proposed instruction, however, on grounds that it failed to take into account the possibility of executive pardon or clemency. The court then reasoned that rather than open the door to inappropriate jury speculation on pardon or clemency (which may have resulted in a harsher penalty), it decided to simply direct the jury to rely on the instructions already presented to it. (*Id*. at 2953.) Included in those instructions was the following: "The words 'imprisonment for life' mean imprisonment for life without possibility of parole." (I J.A. at 447.) Bell argues that by failing to directly answer the jury's question, the trial court allowed the jury to speculate that Bell might be eligible for some form of early release.

The Supreme Court of Virginia addressed this claim on direct appeal. *See Bell I*, 563 S.E.2d at 716-18. The court held that the instruction was sufficient to meet *Simmons*' due process requirements. *Id.* The court noted that had the jury made a

more specific inquiry regarding a particular form of early release, such as geriatric release, it could have safely given a more direct answer. It reasoned that the general nature of the jury's question precluded giving a detailed answer. *Id*. Because this claim was adjudicated on the merits, as set out in § 2254(d)(1), I may grant relief only if the state court acted contrary to or, as Bell asserts, unreasonably applied clearly established federal law. For the following reasons, I find that relief is not warranted.

In *Simmons v. South Carolina*, the Supreme Court of the United States took up the case of a defendant who, having previously pleaded guilty to two violent offenses,[21] was rendered ineligible for parole under South Carolina law. 512 U.S. 154, 156 (1994). During the capital trial, in accordance with prosecution motions, the court ordered the defense barred from asking any voir dire questions regarding parole, and refused to instruct the jury on the definition of "life imprisonment" under state law. *Id*. at 156-57. In denying the instruction, the trial judge indicated a willingness to offer the proposed instruction were the jury to ask specific questions regarding parole ineligibility. *Id*. at 160. However, the trial judge failed to give such an instruction upon an identical question by the jury, and also instructed the jury that parole "is not

---

[21] The defendant beat to death an elderly woman in her home. He had pleaded guilty to first-degree burglary and criminal sexual conduct in connection with two prior assaults on elderly women. Evidence presented during the penalty phase indicated that the defendant's history tended to show years of neglect and severe sexual and physical abuse, which were reflected in his violent behavior. Defense and prosecution witnesses agreed that the defendant posed a continuing danger to elderly women.

-94-

a proper issue for your consideration," thereby implying that the defendant might be paroled. *Id*. at 160. The jury returned a sentence of death twenty-five minutes later. *Id*.

The Supreme Court held that concomitant with the jury's consideration of evidence regarding the defendant's future dangerousness is a defendant's due process right to present evidence related to the "actual duration" of a defendant's prison sentence. *Id*. at 163. Thus, the court's refusal to allow the defendant to present evidence regarding his parole ineligibility deprived him of due process. *Id*. at 162.

I find that *Simmons* is not parallel to this case; in fact, the Virginia trial court afforded Bell the very protection guarded by *Simmons* by instructing the jury that life imprisonment is equal to life imprisonment without parole. While the jury's question related to early release based on something other than parole, the judge's reiteration of his previous instruction served to bolster the jury's reliance on the parole ineligible instruction. Any instruction related to non-parole release is outside the scope of *Simmons*' holding. Because the Virginia court instructed the jury regarding Bell's ineligibility for parole, I find that his due process rights were not violated.

Virginia law in many ways tracks *Simmons*. In *Yarbrough v. Commonwealth*, 519 S.E.2d 602 (Va. 1999), the Supreme Court of Virginia held that upon a defendant's request, a trial court must instruct a jury that "life imprisonment" means

-95-

"imprisonment for life without possibility of parole." *Id.* at 616. The same court in *Fishback v. Commonwealth*, 532 S.E.2d 629 (Va. 2000), held that, in fairness to all parties, jurors should be told that, despite the abolition of parole, certain defendants are still eligible for geriatric release. *Id.* at 634; *see also Bell I*, 563 S.E.2d at 717. However, because geriatric release is in "the nature of parole," jurors determining a sentence for defendants ineligible for geriatric release should be told only of the defendant's ineligibility for parole generally. *Id.* It is clear from the record that the Virginia court properly instructed the jury in accordance with *Simmons*, and that there is no evidence supporting Bell's claim that the Virginia court acted contrary to or unreasonably applied existing law regarding jury instruction on parole ineligibility. Thus, I deny relief on this claim.

4.  FUTURE DANGEROUSNESS
    AGGRAVATOR AS
    UNCONSTITUTIONAL.

Next, Bell asserts that the Virginia statute making future dangerousness an aggravating factor in capital cases is unconstitutional. Bell asserts three bases for his claim. Bell argues that the statutory scheme is unconstitutional because it permits the introduction of unadjudicated bad acts, because it is impermissibly vague, and because of the holding in *Ring v. Arizona*. I analyze each argument in turn, and deny relief on all claims.

-96-

Imposition of the death penalty in Virginia is predicated on proof beyond a reasonable doubt of at least one of two aggravating factors as set out in the Virginia Code. Bell was sentenced to death under the future dangerousness factor, under which the state must prove beyond a reasonable doubt "a probability . . . that [the defendant] would commit criminal acts of violence that would constitute a continuing serious threat to society." Va. Code Ann. § 19.2-264.4© (Michie 2004).

Bell first objects because jurors are permitted to consider evidence of unadjudicated bad acts in determining future dangerousness. Bell argues that any bad acts not previously adjudicated beyond a reasonable doubt must be proved beyond a reasonable doubt in order to be considered by the jury. Virginia law allows the prosecutor to introduce to the jury evidence of unadjudicated bad acts during the penalty phase of the trial, in order to establish that the defendant is a probable future threat of harm to society under the statute. Bell asserts that the Supreme Court of Virginia's denial of relief constituted an unreasonable application of clearly established federal law.

The Supreme Court of Virginia on direct appeal summarily rejected Bell's claim holding it unmeritorious under existing state case law. *Bell I*, 563 S.E.2d at 715. Bell again raised this issue at the state habeas level, apparently merged with claims alleged separately here. *Bell II*, slip op. at 22. The Supreme Court of Virginia, on

-97-

state habeas review, held that Bell's claim regarding unadjudicated bad acts was procedurally defaulted for failure to raise it at trial or on direct appeal. *Id*. at 23. However, this was erroneous. The Supreme Court of Virginia did indeed address Bell's unadjudicated bad acts claim on direct appeal, though summarily. *Bell I*, 563 S.E.2d at 715 ("Bell contends that the admission of evidence regarding unadjudicated criminal conduct during the penalty phase of his trial violated his [constitutional rights] . . . . Bell presents no compelling reason why we should depart from our prior rulings [decided adversely to Bell's position]."). As such, I will treat this portion of the claim as having been adjudicated on the merits in state court, and will grant relief only if I find that the Virginia courts acted contrary to or unreasonably applied clearly established federal law under § 2254(d)(1). I find that is not the case here, and deny relief.

Courts and juries have routinely considered evidence of prior unadjudicated bad acts in assessing future dangerousness. *See Eaton v. Angelone*, 139 F.3d 990, 998 (4th Cir. 1998) (citing Supreme Court and Fourth Circuit cases upholding sentences based on unadjudicated prior bad acts, and finding the practice permissible). The Supreme Court has determined that a sentencing jury must have before it all information relevant to its determination and be left to weigh the evidence as it sees fit, as only the fact finder has the benefit of cross-examination and contrary evidence by the opposing

party.  *See Jurek v. Texas*, 428 U.S. 262, 276 (1976); *Barefoot v. Estelle*, 463 U.S. 880, 898 (1983).

Relatedly, the Fourth Circuit has applied *Jurek v. Texas* to approve the constitutionality of an aggravating scheme "identical" to Virginia's.  *Briley v. Bass*, 750 F.2d 1238, 1245 (4th Cir. 1984).  It has also upheld the use of a wide range of evidence relevant to the future dangerousness inquiry.  *See Giarratano v. Procunier*, 891 F.2d 483, 489-90 (4th Cir. 1989).  Thus, the Supreme Court of Virginia followed existing, clearly established federal law in denying Bell relief on his claim that the introduction of unadjudicated bad acts resulted in a violation of his constitutional rights.  Because there is no contravention or unreasonable application of clearly established federal law, I deny relief.

Bell next argues that the aggravating factor of future dangerousness is unconstitutionally vague in violation of the Eighth Amendment.  Bell takes further issue with the fact that the trial court failed to offer a limiting instruction defining certain terms within the jury charge.

On state habeas review, the Supreme Court of Virginia held that Bell's vagueness challenge was barred because the issue was raised and decided both in the trial court and on direct appeal.  The court cited *Henry v. Warden*, 576 S.E.2d 495,

-99-

496 (Va. 2003), for the proposition that claims decided by the trial court and on direct appeal are barred from habeas review.

This court, sitting in habeas review, may not reexamine a determination based only on application of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). However, where the petitioner's claim concerns a federal constitutional issue, the rule set out in *Henry* does not prevent federal habeas review of the claim. See *Goins*, 226 F.3d at 320 n.3 (recognizing that the rule in precursor to *Henry* does not prevent federal habeas review of otherwise properly raised claims). Because this claim was adjudicated on the merits in state court, however, I must apply the deferential review set out in § 2254(d), and grant relief only if the state court decision contravened or unreasonably applied clearly established federal law. As above, Bell fails to offer sufficient grounds to afford relief.

In order to impose the death penalty on a defendant, the Supreme Court has held that the trier of fact must convict the defendant of murder and find at least one aggravating factor. *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Further, the Court has held that the aggravating factor must meet two conditions: First, that it apply not to all defendants convicted of murder, but rather to a subclass. *Id*. Second, the aggravating factor must not be unconstitutionally vague, meaning that it is defined in terms too vague to provide sufficient guidance to the sentencer. *Id*. The factor

must have "some 'common-sense core of meaning'" that criminal juries may capably understand. *Id*. at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976)). The Fourth Circuit has found Virginia's sentencing scheme to be constitutional, even in light of a vagueness challenge like the one Bell brings here. *See Briley v. Bass*, 750 F.2d at 1245 ("The constitutionality of [Virginia's future dangerousness aggravator] is beyond question" in light of *Jurek*.). Because Bell presents no compelling reason why, under § 2254(d), I should depart from that ruling, I deny relief.[22]

### 5. AGGRAVATING FACTORS BEYOND A REASONABLE DOUBT.

Bell's third claim is based on *Ring v. Arizona*, in which the Supreme Court of the United States held that statutory aggravating factors must be found by a jury beyond a reasonable doubt. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002). Bell argues that the Virginia statute violates *Ring*, in allowing the jury to impose a death sentence upon finding a "probability" of future dangerousness beyond a reasonable doubt, rather than future dangerousness per se.

---

[22]    Bell correctly points out that the Supreme Court of Virginia defined the statutory terms "criminal acts of violence" and "probability" in *Smith v. Commonwealth*, 248 S.E.2d 135, 149 (Va. 1978). However, in so doing, the court did not attach a requirement that all juries be apprised of its construction. For the same reason as above, I find that relief on this claim is unwarranted under § 2254(d).

-101-

While Bell argues that *Ring v. Arizona* effected a change in the law sufficient to afford relief on his claim in this court, the Supreme Court in *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), determined that under *Teague*, *Ring* was a procedural decision, did not apply retroactively to cases already decided on direct appeal, and did not announce a watershed rule of criminal procedure. Thus, I may not retroactively apply *Ring* here. As such, I find that the Virginia court did not act contrary to or unreasonably apply clearly established federal law in denying Bell relief on this claim, and I deny relief.

## F. CLAIM VI—ALLEGED VIOLATIONS OF BELL'S RIGHT TO TRIAL BY JURY.

Bell alleges numerous instances of juror misconduct which he contends entitle him to habeas relief. Bell asserts that jurors were biased, that they deliberated before the trial was complete, that they slept during the trial, that thirteen jurors deliberated in the guilt phase of trial, and that pretrial publicity and uniformed police spectators violated his right to a fair trial. I review each claim in turn.

### 1. JUROR BIAS.

Bell first asserts that two of the jurors impaneled at his trial had relationships with the victim's family such that his constitutional right to a fair and impartial jury was violated.

The Sixth Amendment guarantees the accused in criminal prosecutions "the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. This guarantee is applicable to the states through the Fourteenth Amendment. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). Further, the Supreme Court has held that due process requires that a capable and willing jury decide a case solely on the evidence before it. *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Bell relies on two affidavits by alternate juror Larry J. Miles. In the first, presented to the Supreme Court of Virginia during its habeas review, Miles swore he overheard a conversation between two "older lad[y]" jurors, whose names he cannot recall, discussing their relationship with the victim and his family, and about "knowing the family of the victim . . . by their names . . . [and] going to church . . . and . . . on picnics with [the victim]'s family." (Miles Aff. ¶ 4, Pet'r's State App., Ex. 13.) Only one of the seated jurors questioned on voir dire revealed any relation with the Timbrooks that matched the relationship indicated by juror Miles.[23] After the Supreme Court of Virginia indicated doubt about whether the allegedly biased jurors had actually been seated, *Bell II*, slip op. at 13, Bell proffered a second affidavit in this

---

[23]   Juror Mary J. Hutchings revealed a casual relationship with the victim's sister-in-law and that she knew the victim's wife by sight, but reported that she could decide the case without worrying about her acquaintance's reaction upon a finding of "not guilty." (III J.A. 1251-53, 1262-63.)

-103-

proceeding,[24] conclusively stating that the women in question were seated members of the jury: "[W]hen I said that 'there were two older ladies on the *jury*'–I meant two people who heard the entire trial and deliberated and made a decision on the case." (Miles Aff. ¶ 5, Pet'r's App., Ex. 46.)

During the voir dire portion of the trial, the court and parties were thorough in questioning jurors on potential relationships with the victim or his family. Potential jurors were asked: "Are you now, or have you at any time in the past, been a friend of any member of Mr. Timbrook's family?" (III J.A. at 1119.) Regarding each witness from the list of potential witnesses read to the jury, the court asked whether any juror was "related to the witness . . . or . . . otherwise kn[e]w the witness?" (III J.A. at 1120.) Further, the court had the victim's widow, mother, and father each stand during this part of the questioning. Among other things, the jury panel was also asked if any individual had any interest in the outcome of the case or were aware of any bias or prejudice against the defendant.

Bell asserts that the jurors identified by Miles lied during voir dire and were unconstitutionally biased against him during trial. The state argues that all jurors having a disqualifying relationship with the victim's family were questioned and

---

[24]    The state disputes the authenticity of the new Miles affidavit, although the grounds of its objection are not apparent. Accordingly, I assume without deciding that the second document submitted by Miles is, in fact, authentic.

excused. It argues that, even assuming that juror Miles' declaration is true, the two unidentified jurors could have answered the questions correctly. Jurors who knew of the Timbrook family, or who may have gone to church or on picnics with the family but who did not know the victim or consider themselves "friends" of the family, were retained and were not unqualified, nor Bell injured by their presence on the jury.

Particularly, Bell asserts three constitutional violations: first, that the jurors' lack of candor or failure to answer questions honestly amounted to actual bias; second, that the jurors' lack of honesty resulted in, at least, implied bias; and third, that because these "tainted" jurors spoke with fellow jurors about their relationship with the victim's family, Bell's for-cause challenges were unconstitutionally impeded. For these reasons, Bell asserts that he is entitled to habeas relief or, alternatively, an evidentiary hearing.

The Supreme Court of Virginia heard Bell's claim on state habeas review and found it unmeritorious for two reasons: First, because Bell failed to allege whether the women were actually seated on the jury, and second, because the trial court's questioning the entire venire whether any juror had any relationship with any member of the victim's family was sufficient to eliminate any juror bias. *Bell II*, slip op. at 13. The court provided that all potential jurors with such relationships were excused, save

one juror who was acquainted with the victim's family but was questioned and deemed fit to serve. *Id*.

Even considering that Miles' new affidavit was not presented to the state court, I find that the correctness of the state court's determination has not been adequately rebutted. There is no indication that the jurors identified by Miles failed to honestly answer the voir dire questions. As argued by the state, they may have only known of the victim's family, without any relationship more than that exhibited by juror Hutchings, who was not disqualified.

Further, even if a writ of habeas corpus is authorized under § 2254(d), a petitioner is not entitled to relief unless he can show "that any constitutional errors committed had substantial and injurious effect or influence on the verdict rendered by the jury." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (internal quotations omitted). I find that Bell's jury bias claim, based on the circumstances described here, cannot be said to have had such an effect or influence.

## 2. PREDELIBERATION BY JURORS.

Bell alleges that the court's instructions to the jury failed to make clear to jurors that they were not to discuss the case before hearing all of the evidence, and that he was harmed by the jurors engaging in such predeliberation.

In particular, Bell alleges that the trial court's instructions never fully prohibited the jury from deliberating prior to the close of all the evidence, which resulted in jurors deliberating prematurely, comparing notes with one another, and allowing alternates to deliberate. Bell contends that the court's instructions and the jurors' alleged predeliberation violated his right to an impartial and attentive jury under the Constitution. Bell argues that he is entitled to relief on these grounds. I disagree and deny relief on this claim.

The Supreme Court of Virginia reviewed Bell's claim at the state habeas level, and determined that, although it had been raised and decided at trial, Bell's failure to raise it on direct appeal rendered it procedurally defaulted in that court. *Bell II*, slip op. at 14. In so holding, the court cited *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), which prohibits state habeas review of claims that were available to the petitioner at trial or on direct appeal but were not raised at that time.

As explained above, *Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998), prohibits my review of a state court's finding of procedural default if it was based upon an adequate and independent state law ground. In this case, the Supreme Court of Virginia's application of *Slayton*'s procedural default rule provides an adequate and independent state law ground upon which to deny federal habeas relief, barring cause

-107-

and actual prejudice or a miscarriage of justice.  *See Mu'Min v. Pruett*, 125 F.3d 192, 196 (4th Cir. 1997).

To show cause, the petitioner must demonstrate some objective factor external to his defense that impeded counsel's efforts to comply with the state's procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate prejudice, a defendant must show not merely that there was a possibility of prejudice, but that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional magnitude.  *Id*. at 494.  Bell claims that his counsel were ineffective at trial in not securing an instruction clarifying the jurors' duty not to predeliberate, and that their ineffectiveness constitutes cause sufficient to overcome the alleged procedural default.  Further, Bell alleges that the fact that his claim is meritorious is sufficient to establish prejudice.  I disagree with both assertions and deny relief.

Bell asserts that his counsel were unconstitutionally ineffective for failing to secure an instruction clarifying that jurors were not to discuss the case prior to the close of all the evidence.  As explained above, to establish ineffective assistance under *Strickland*, Bell must show both that his counsel were deficient and that the deficiency was prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

-108-

Bell cannot show either prong. The trial court instructed the jurors not to draw conclusions about the case prior to the end of trial, not to discuss such conclusions unless all jurors were present and in the jury room together, and that they should keep an open mind and not *decide* any issue until the close of evidence and further instructions from the court. (IV J.A. at 1635.) Just prior to lunch breaks, the jurors were instructed not to discuss the case over lunch, even if they ate with each other, and that deliberations were not to begin yet, and never unless all members were together in the jury room. (V J.A. at 1891-92.) The trial judge further instructed jurors to alert him if *anyone* attempted to discuss the case with them during the lunch break, and to break off the conversation if that did occur. (*Id.*)

At another point in the trial, the court cautioned jurors not to compare notes with one another, and that discussions between jurors should be delayed until "all of the evidence [is] in" and deliberations begin. (VI J.A. at 2321.) It appears that this admonition was prompted by a suggestion that the jurors had been comparing notes with one another. (*Id.*) In responding promptly to that assertion, the judge reiterated that jurors may take notes, but that they may not discuss them until deliberations begin. (*Id.*) Taken together, these instructions provided adequate guidance to prevent jurors from deliberating before the proper time, and do not provide sufficient grounds for either prong of a *Strickland* claim.

-109-

The only allegation Bell makes regarding actual predeliberation by jurors was contained in an affidavit by Bell's trial counsel, Mark Williams, which was submitted to the Supreme Court of Virginia with Bell's state habeas petition. In that affidavit Williams states that juror Larry J. Miles reported after the completion of trial that jurors had predeliberated. (M. Williams Aff. ¶ 13, Pet'r's State App., Ex. 20.) Bell also alleges that there was some evidence in the record suggesting that jurors "may have been" comparing notes during the trial, though Bell presents no other allegation on this point. Even had the predeliberation actually taken place, Bell has not clearly articulated a federal constitutional right impaired by the alleged predeliberation. Because Bell cannot show ineffective assistance of counsel, I must find that his claim is procedurally defaulted in this court and deny relief.

### 3. SLEEPING JURORS.

Bell contends that he is entitled to relief as a result of the trial court's failure to investigate and act upon information that certain jurors were becoming sleepy and nodding off during trial. Bell also asserts that his counsel were ineffective in failing to challenge the offending jurors, request replacement jurors, and move for a mistrial.

The Supreme Court of Virginia heard Bell's substantive claim on habeas review and found that it was procedurally barred for not having been raised at trial or on direct appeal, pursuant to *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974). In Bell's

case, the state court's application of *Slayton*'s procedural default rule provides an adequate and independent state law ground upon which to deny relief on federal habeas review, barring cause and actual prejudice or a miscarriage of justice. Bell is unable to meet his burden in showing cause and actual prejudice, and therefore I must deny relief.

The Supreme Court of Virginia reached the merits of Bell's ineffective assistance claim, finding that Bell met neither the performance nor prejudice prong of *Strickland*. Because this portion of the claim was decided on the merits on state habeas review, it is entitled to a presumption of correctness under § 2254(e)(1) that may be rebutted only upon a showing of clear and convincing evidence. I find that Bell presents no such showing in this case. The relevant facts are as follows.

The record shows that at a bench conference on day two of the trial, the clerk indicated to the judge and parties: "The first lady. Both struggling to stay awake." (IV J.A. at 1737.) The clerk was apparently concerned that two jurors had had trouble staying awake during the preceding portion of the trial. The lawyers responded that the courtroom was hot, that it had been a long day, and that all jurors were becoming tired. (*Id*. at 1737-38.) The trial judge allowed the introduction of two more "short" witnesses; after the close of the final witness, the lawyers brought to the court's attention that two jurors had struggled to stay awake, and had been closing their eyes

-111-

and nodding off. (*Id*. at 1751.) The trial judge noted that he had not seen the same because, at his angle, he was unable to see the jury at all times. (*Id*.) The judge noted that he would be on notice for the next day, recommended that the courtroom temperature be lowered, and adjourned for the day at 5:05 P.M. (*Id.* at 1751-52.)

On day three of the trial, at the close of witness Holben, the parties offered a joint motion to conclude for the day because "[t]he jury is exhausted. We are losing them. One of them is having some trouble . . . ." (V J.A. at 2044. ) The prosecutor reported that "[o]ne lady slept through pretty much the last testimony." He also reported that he had been unable to watch them, but that his staff had reported that "one lady almost fell off her chair." (V J.A. at 2045. ) The clerk confirmed that it was the same juror who had trouble the day before. (*Id*.) In response, the judge indicated that he had been watching very closely, and granted the parties' motion to conclude for the day as the next witness would be "tedious." (*Id*.)

On day five of the trial, the prosecutor stated that the jury has "been struggling here this last hour again," and that he would "wake this jury up." (VI J.A. at 2430.) Defense counsel indicated that it was the same *male* juror that had had problems previously. (*Id*.) The court reported that it had "been watching," and stated, "I am not saying they don't get tired, but I haven't seen anybody nodding off." (*Id*. at 2431.)

Bell claims that, although his claim was found procedurally defaulted by the Supreme Court of Virginia, the fact that his counsel were ineffective in failing to object to the sleeping jurors, failing to ask for replacement jurors, and failing to move for a new trial demonstrates adequate cause for the default. Further, Bell asserts that because his claim is meritorious, he meets the actual prejudice standard. I disagree, and find that his counsel were not ineffective under *Strickland*, and that Bell is not entitled to relief from this court.

An ineffective assistance claim under *Strickland v. Washington* requires that Bell show that his counsel's performance was deficient, and that the deficiency prejudiced the defense. 466 U.S. at 687. Bell is unable to meet his burden. In the cases cited by Bell, it was clear from the record that the trial court knew or acknowledged that a particular juror had slept through material portions of the trial. *See Spunaugle v. State*, 946 P.2d 246, 253 (Okla. Crim. App. 1997) (reversing trial court's denial of defendant's motion to replace juror with alternate where trial judge stated on the record that juror had "dozed during parts of the trial"); *People v. South*, 576 N.Y.S.2d 314, 314-15 (N.Y. App. Div. 1991) (ordering new trial upon evidence that juror had slept through testimony and court's charge and upon trial court's acknowledgment that juror had closed her eyes during charge); *People v. Evans*, 710

-113-

P.2d 1167, 1168 (Colo. Ct. App. 1985) (ordering new trial where trial court knew that juror was sleeping during defense's closing argument).

Here the evidence is far less compelling. The record indicates that at the end of long trial days, the entire jury became tired, and that particular members struggled to stay awake. However, the trial judge noted and paid close attention to jurors after the initial incident, and took steps to end for the day when it was evident the jurors were losing concentration. There is no evidence, from the parties or the court, of particular jurors having slept through portions of the trial, as in cases in which courts have granted relief on such claims. I find that counsel were not ineffective in performance, as they clearly notified the court when jurors became sleepy, and in response, the court reasonably and promptly responded to their suggestions regarding jurors.

Even if Bell's counsel had moved to replace jurors with alternates or for a new trial, I find it unlikely that the court would have granted such relief because the evidence was not sufficiently strong to warrant it. It is clear from my review of the record that Bell's counsel responded appropriately to the facts before them, and that Bell was not prejudiced by their failure to act. Thus, Bell demonstrates neither the performance nor the prejudice prong under *Strickland*. Because Bell fails to demonstrate that his counsel were ineffective, I find that he fails to meet his cause and

-114-

prejudice burden, and that his claim is procedurally defaulted as set out by the Supreme Court of Virginia. I therefore deny habeas relief on this claim.

### 4. DELIBERATIONS BY ALTERNATE JURORS.

Next, Bell alleges that he is entitled to habeas relief from this court because thirteen jurors deliberated in his case in violation of Article III, Section 2 of the United States Constitution and the Sixth Amendment, both of which guarantee a trial by jury to criminal defendants. Bell also asserts that his trial counsel were ineffective for failing to object to the fact that thirteen jurors deliberated.

Bell presented this claim for the first time in his petition for state habeas relief, and the Supreme Court of Virginia found it procedurally defaulted under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), for having failed to raise the issue at trial or on direct appeal. *Bell II*, slip op. at 17-18. The court also held Bell's ineffective assistance of counsel claim unmeritorious on the facts and under the *Strickland* two-prong test. *Id*. at 18-19.

The record shows that after closing statements and prior to the formal charge to the jury, the court excused three alternate jurors who had been seated and had heard all of the evidence in Bell's case. (VII J.A. at 2764-65.) The alternates, Larry J. Miles, Charles D. Wood, Jr., and Michael D. Weir were excused and stepped out of the jury box, and the remaining twelve jurors were given the charge and sent to the

-115-

jury room to deliberate.  (*Id*. at 2765-68.)  Upon returning with and announcing a verdict, the defense moved for a poll of the jury.  (*Id*. at 2770.)  The record reflects that thirteen jurors were polled and responded that the verdict was theirs.  (*Id*. at 2770-72.)  Among those recorded as polled was Michael D. Weir, who had previously been excused as an alternate.  (*Id*. at 2772.)  Bell accordingly asserts that thirteen jurors were involved in the guilt phase deliberations.  There is ample evidence, however, that the record erroneously recorded Mr. Weir's vote and that he did not in fact participate in deliberations.

In its response to Bell's state habeas petition before the Supreme Court of Virginia, the state filed an affidavit from the court reporter stating, "I included juror number 30, Michael Weir, in error, in the original transcript, Mr. Weir having been previously excluded before deliberations began." (Grimsley-Logan Aff. ¶ 5, Resp't's State App., Ex. 9.)  Further, the polling at the sentencing phase records the verdicts of twelve jurors and does not include a vote from Mr. Weir.  (VII J. A. at 2943-45.)  Last, neither party objected nor raised the issue with the court at the time of trial.  This evidence, together with the court reporter's affidavit, clearly indicates that the guilt phase poll was erroneously reported, and that twelve rather than thirteen jurors deliberated.

-116-

Moreover, the Constitution does not require a twelve-person jury in state criminal trials. *See Williams v. Florida*, 399 U.S. 78, 86 (1970). I find that Bell is unable to meet the cause-and-prejudice standard sufficient to be afforded relief on his substantive claim. I also find that the Supreme Court of Virginia's decision regarding Bell's ineffective assistance of counsel claim must stand, as Bell has presented no clear and convincing evidence to rebut the presumption of correctness of the state court's decision under § 2254(e)(1). I find no evidence that the state court contravened or unreasonably applied federal law, or unreasonably determined the facts in this case under § 2254(d). Accordingly, I deny habeas relief.

### 5. PRETRIAL PUBLICITY AND PRESENCE OF UNIFORMED POLICE SPECTATORS.

Bell next asserts that his right to a fair trial was impeded both by extensive pretrial publicity, and by the presence of uniformed police officers in the gallery during the course of the trial. More specifically, Bell alleges that he is entitled to habeas relief from this court based on the totality of the circumstances of his trial or, alternatively, an evidentiary hearing on each of the claims. For the reasons explained below, I reject these claims.

Prior to and at trial, Bell filed several motions relating to publicity and uniforms in the courtroom. In a written pretrial motion, Bell moved to enjoin law enforcement officers from wearing uniforms in the courtroom while sitting as spectators, arguing

-117-

that their presence would suggest to the jury that Bell is dangerous and that extra security is needed. Counsel also argued that the presence of uniformed officers would persuade the jury to base its verdict or sentence on considerations regarding the victim rather than the defendant's conduct. The court denied that motion.

Next, concerned about prejudice to the defendant, Bell orally moved the court to exclude from the courtroom insignias or tokens supportive of the state's position or memorializing Sergeant Timbrook. With the state's approval, the trial judge granted that motion. Next, counsel and the court took up the issue of venue and, in particular, whether to hold the trial in Winchester with a Staunton jury, or hold the trial in Staunton, assuming a Winchester jury could not be successfully impaneled. Bell's counsel appears to have moved to conduct jury selection in Staunton and the trial in Winchester. The court decided to withhold judgment on the matter, and the issue ultimately became moot when a Winchester jury was successfully impaneled.

Finally, Bell's counsel subpoenaed all written articles pertaining to the defendant in the murder of Sergeant Timbrook, which the newspapers in question moved to quash. The court granted the motion to quash, but allowed defense counsel to bill staff time for collecting the necessary information. The record contains no follow-up discussions regarding the collection of articles, nor evidence that such articles were presented to the court.

-118-

On direct appeal, Bell raised the issue regarding officers in the courtroom, but not the pretrial publicity issue. *See Bell I*, 563 S.E.2d at 713. Regarding spectators, the court found that Bell's motion to preclude uniformed officers had not been fully denied by the trial court. The trial court had allowed officers involved in the trial as bailiffs, witnesses, or security guards to wear uniforms, as well as on-duty police spectators, but had noted the potential for an "oppressive atmosphere" should too many uninvolved off-duty uniformed officers attend the trial. The trial court noted that it would address that situation if it became necessary. However, neither the court sua sponte nor Bell's attorneys ever raised such objections; thus, the reviewing court found that there was no error in the trial court's ruling on the defense motion. *Id.*

On state habeas review, the Supreme Court of Virginia found Bell's change of venue claim procedurally defaulted because it was not raised on direct appeal. *Bell II*, slip op. at 26. Because the default was based on an adequate and independent state ground, I may grant relief on this claim only if Bell shows cause and actual prejudice, as outlined in previous sections of this opinion. As to the claim regarding uniformed officers, which was adjudicated on the merits in state court, § 2254(e)(1) requires that I presume the Supreme Court of Virginia's decision correct absent clear and convincing evidence to the contrary. I find that Bell is unable to prove otherwise.

-119-

Attendant to the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments is the principle that the accused is entitled to have his guilt or innocence determined solely on the basis of evidence introduced at trial, rather than "on grounds of official suspicion, indictment, continued custody" or other circumstances not proved at trial. *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). For example, inherent prejudice arises when a defendant is compelled to wear shackles in front of his jury. *See Illinois v. Allen*, 397 U.S. 337, 344 (1970).

Applying that principle in *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986), the Supreme Court of the United States opined that not "every practice tending to single out the accused from everyone else in the courtroom" bears constitutional implications. In that case, the Court reviewed a claim brought by an incarcerated defendant alleging that his fair trial rights were impeded by the presence of four uniformed state troopers on the front row of the gallery during his trial. The Court acknowledged that, unlike shackles, the presence of identifiable security officers in the courtroom does not inherently prejudice a defendant, recognizing that there are a number of conclusions a jury may draw from the officers' presence. *Id*. at 569. The Court held that the presence of uniformed officers was not enough to unmistakably brand the defendant with a mark of guilt. *Id*. at 571. In reaching its decision, the Court adopted the following test for determining if the presence of uniformed officers

-120-

during a criminal trial was unconstitutionally prejudicial: "whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* at 570 (quoting *Estelle v. Williams*, 425 U.S. 401, 505 (1976)). Such a claim is difficult to establish, and in making a determination on Bell's claim I must assess the scene presented to the jurors and determine whether what they observed was inherently prejudicial so as to pose an unacceptable threat to the defendant's right to a fair trial. *Id.* at 572.

In support of his *Holbrook* claim, Bell relies on *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991). The habeas petitioner in *Woods* had been convicted of murdering a correctional officer. The crime had occurred in a small, rural community in which the prison where the murder occurred provided employment for a significant proportion of the population. Just prior to the murder, the correctional officer had spoken publicly about understaffing at the prison, stating that he feared for his life. *Id.* at 1458. In addition to overwhelming media coverage of the case, the officer's family had circulated a petition signed by five thousand individuals calling for the death penalty for murders committed by incarcerated persons. *Id.* Most importantly in *Wood*, however, was the presence of forty-five uniformed prison guards during significant portions of the trial for no reason other than to observe the proceedings. The court held that in light of all the circumstances, the guards' presence at trial sent an unmistakable message that the defendant was guilty and deserved death as

punishment.  *Id*. at 1459-60.  The court found that, as a result, the petitioner had been denied a fair trial.  *Id*. at 1460.

In Bell's case, conversely, the presence of uniformed officers during Bell's trial did not "brand" him with unmistakable guilt.  *Holbrook*, 475 U.S. at 571.  Winchester is a small community and, accordingly, there was substantial publicity surrounding the trial.  The record is clear that there were indeed uniformed officers in the courtroom as court employees, witnesses, and as spectators.  However, there is no allegation that the officers were concentrated in a way that created an impression that Bell was dangerous, or that they were present in numbers similar to that in *Woods*.  Further, the trial judge clearly acknowledged the potential for prejudice created by the presence of uniformed officers, and there is no evidence that any such problem arose during the course of the trial.  The trial judge also made well-reasoned decisions prohibiting potentially prejudicial apparel and insignias in the courtroom, and providing the defense with an opportunity to investigate local newspaper coverage of the trial.

In light of the evidence contained in the record, I find that the presence of the officers in the courtroom, even when coupled with the pretrial publicity, did not pose an unacceptable threat to Bell's right to a fair trial, nor was there an unacceptable risk of impermissible factors having come into play.  Accordingly, the state court's

-122-

decision regarding officers in the courtroom is neither contrary to nor an unreasonable application of clearly established federal law under *Holbrook* or the United States Constitution. I therefore deny habeas relief.

Similarly, I find that an evidentiary hearing on the matter is unwarranted, as the existing record clearly articulates the basis for the trial court's and reviewing court's reasonable decisions on these issues. Under § 2254(e)(2), I may not hold an evidentiary hearing unless a petitioner demonstrates facts not previously discoverable through due diligence, and that clear and convincing evidence provides that he would not have been found guilty of the underlying offense. For the reasons already stated, Bell fails to meet his burden. Thus, I must deny his request for an evidentiary hearing.

As to Bell's change of venue claim, I find for similar reasons that he has not sufficiently shown cause and prejudice to overcome the state procedural default.

### G. CLAIM VII—VIOLATION OF BELL'S RIGHT TO BE PRESENT AT TRIAL.

Bell next alleges that his rights under the Confrontation and Due Process Clauses were violated when he was excluded from critical stages of his own trial, and when a trial witness was permitted to give prejudicial, unsworn testimony.

#### 1. CRITICAL STAGES OF TRIAL.

Bell asserts that his confrontation and due process rights were violated on numerous occasions during which conferences and jury and witness interactions were

held outside his presence. In particular, Bell asserts that he was absent for conferences regarding (1) DNA and fiber analysis tests, (2) whether to admit Bell's prior conviction, (3) whether to play 911 tapes for the jury, (4) whether and how to shackle Bell at trial, and (5) Bell's own statement. Bell also cites absences during conferences regarding prosecution witness Terry Lee Johnson. Specifically, Bell cites a hearing during which Bell's attorney communicated a conflict of interest for having previously represented Johnson, and an additional hearing regarding the failure to administer an oath to Johnson prior to his testimony. Bell last alleges absences from a hearing determining the court's response to a juror question regarding Bell's potential release from a life imprisonment sentence, and from the jury's viewing of the crime scene.

On state habeas review, the Supreme Court of Virginia found this claim procedurally defaulted for not having been raised on direct appeal. *Bell II*, slip op. at 19. The court held unmeritorious Bell's ineffective assistance of counsel claim, reasoning that Bell was not harmed by his counsel's failure to object to his absences because no evidence indicated that Bell had not been informed of the discussions from which he was absent, or that he had objected to his absence. *Id*. at 19-20. The court also noted that the substance of some conferences was summarized on the record. *Id*. at 19.

-124-

Bell concedes that his substantive claim was procedurally defaulted on state habeas review, but alleges that he is able to show cause and actual prejudice sufficient to overcome the finding of default. Bell alleges he meets the cause prong because his counsel were ineffective for failing to object to his absence from portions of his trial. He alleges prejudice because his claim is "meritorious." I find that Bell fails to meet the cause-and-prejudice standard as required to overcome a finding of procedural default under the AEDPA and *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). For the foregoing reasons, I deny relief.

The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right extends to defendants in both federal and state proceedings. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The primary interest secured by the Confrontation Clause is a defendant's right to cross-examination, *Douglas v. Alabama*, 380 U.S. 415, 418 (1965), which is critical to ensuring the integrity of the fact-finding process. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). A defendant's right to be present extends not only to trial proceedings, but to all critical stages of the proceedings. *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). When determining whether a constitutional violation occurred, I must also consider

whether the defendant's exclusion from the hearing interfered with his ability to cross-examine effectively. *Id.* at 740.

Bell asserts that his counsel were sufficiently ineffective to meet the "cause" prong required by *Coleman*. The Supreme Court of Virginia on habeas review, however, determined that Bell's counsel were not ineffective under either the performance or the prejudice prong of *Strickland*. Under § 2254, I may only grant relief on this claim if Bell shows that the state court unreasonably applied or acted contrary to existing federal law. Bell fails to do so.

Here, after reviewing all of the alleged errors, I find that the proceedings from which Bell alleges his erroneous absence neither were critical stages of the trial nor interfered with his ability to cross-examine. I find also that Bell's absence from any of the proceedings did not inhibit his opportunity to defend against the charge. *See Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 17 (1964). No instance cited by Bell involved an out-of-court examination of a witness, nor a situation in which a witness could not be cross-examined again in open court in front of the jury. Most instances were related to evidence to be admitted at trial. Some evidence, like the testimony of an additional DNA expert, was favorable to Bell's position and was allowed by the judge. In the case of evidence not favorable to Bell, Bell was presented with the

-126-

opportunity, in open court, to object to the admission of such testimony and to cross-examine any opposing witnesses. Other conferences related to insignificant aspects of trial, like alerting the trial court to the upcoming introduction of evidence and resolving a question regarding the proper numbering of an exhibit. (V J.A. at 2051-52.)

I also find that fairness was not frustrated by his absence, and, in fact, was guarded closely by the trial court. Generally, it was clear that in the proceedings cited by Bell, the judge and the parties were sensitive to Bell's absence, and the judge prefaced discussions by setting parameters regarding the scope of what could fairly be covered outside Bell's presence. (III J.A. at 866-67.) On at least one occasion the judge halted the proceeding so that the defendant could be brought in before continuing. (IV J.A. at 1616.) On another occasion, the judge offered to summarize a conference on the record, but Bell's counsel volunteered to brief Bell during a break. (V J.A. at 2053.) Fairness to Bell was clearly protected by the actions of the judge and the parties.

Because there is no evidence that Bell's confrontation rights were compromised by his intermittent absence from pretrial and trial proceedings, I find that Bell is unable to meet either the performance or prejudice standard required for an ineffective

-127-

assistance claim under *Strickland*. Thus, he is unable to overcome the procedural default found by the Supreme Court of Virginia, and I must accordingly deny relief.

In addition to his Confrontation Clause claim, Bell asserts a concurrent claim that his absence from certain trial proceedings violated his due process rights. The Court has also held that a defendant has a right under the Due Process Clause of the Fourteenth Amendment to "be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder*, 291 U.S. at 105-06. Due process requires that a defendant be present "to the extent that a fair and just hearing would be thwarted by his absence." *Id*. at 108. Stated differently, a defendant is entitled to be present at any stage of the criminal proceeding against him that is critical to its outcome if his presence would contribute to the fairness of the proceeding. *Stincer*, 482 U.S. at 745. For the reasons stated above, I find that there is no cognizable due process claim here sufficient to overcome the Supreme Court of Virginia's finding of procedural default on Bell's substantive and ineffective assistance of counsel claims. I therefore deny relief.

## 2. UNSWORN TESTIMONY.

Bell next argues that his confrontation rights were violated when Terry Lee Johnson, a prosecution witness, gave testimony at trial without having first been sworn.

-128-

Witness Terry Lee Johnson was brought to the courtroom during the end of a conference on a number of small matters.  In the haste to resume the trial, the court failed to administer an oath to him before he began his testimony.  After Johnson's testimony, the prosecution rested.  (VI J.A. at 2546.)  The following morning, it appears that the parties had an off-the-record conference regarding the failure to swear in Johnson, the outcome of which was reflected in the trial court's summary the next day.  (IV J.A. at 2558.)  Outside the presence of the jury, Johnson was returned to the stand and swore that the testimony he had given the previous day was truthful.  (*Id.* at 2559.)  The jury was apprised of Johnson's recall and retroactive oath upon returning to the jury box, but did not witness it.  (*Id.* at 2569.)

Johnson's testimony proved damning to Bell.  On direct examination, Johnson testified that he was housed near Bell in jail and grew to know him fairly well.  He stated that Bell had told him about killing Sergeant Timbrook and that he had been offered no deal or incentive in exchange for his testimony.  Bell asserts that Johnson's testimony was false, citing an affidavit in which Johnson repeatedly told police that he knew nothing about the case, that police had provided reports from which Johnson had allegedly created his testimony, and that he was offered a two and a half year sentence reduction, a transfer to a favorable work unit, and visits from family and his

-129-

girlfriend.  Bell claims that his Sixth Amendment rights were violated by the court's failure to have initially administered an oath to Johnson and that he is entitled to relief.

On state habeas review, the Supreme Court of Virginia found this claim procedurally defaulted for not having been raised at trial or on direct appeal.  *Bell II*, slip op. at 16-17.[25]  *Id.*  Under *Murray v. Carrier*, 477 U.S. 478, 489 (1986), I may not review a claim of ineffective assistance of counsel that was not raised in the state courts.  Because Bell provides no evidence of cause and prejudice or a fundamental miscarriage of justice as required by *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), I find that his claim is procedurally defaulted here, and I must deny relief.

### H.  CLAIM VIII—DEPRIVATION OF THE PRESUMPTION OF INNOCENCE.

Bell next contends that his appearance in shackles in view of potential jurors during voir dire impermissibly violated his due process rights and tainted the

---

[25]    Bell argues that he presented a related ineffective assistance of counsel claim to the Supreme Court of Virginia on two occasions. First, Bell raised the issue in his petition for rehearing, which was denied by the court.  Under *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991), I find that the court did not "fairly appear" to rest on federal law when denying the petition for rehearing.  A presumption of procedural default is therefore warranted.  *Id.*

Bell allegedly raised this claim for a second time in his corrected petition for state habeas relief.  While Bell does assert a blanket ineffective assistance claim in that petition, he fails to allege the substantive claim with which the ineffective assistance claim would have corresponded.  Thus, it is clear that this ineffective assistance of counsel claim was never properly raised with the Supreme Court of Virginia.

-130-

presumption of innocence to which he was entitled. Bell argues that he is entitled to habeas relief or, at a minimum, an evidentiary hearing on this issue.

On state habeas review, the Supreme Court of Virginia found that this claim was procedurally defaulted because it was not raised at trial or on direct appeal. *Bell II*, slip op. at 20. Bell also asserted at the state habeas level that his counsel were ineffective in failing to object on the record to the use of shackles and the related in-chambers conference, and in failing to raise this issue on direct appeal. *Id.* at 20. The court held that Bell's claim for ineffective assistance was unmeritorious in failing to meet either prong of the *Strickland* test. *Id.* at 20-21. The relevant facts are as follows.

The trial record indicates that for a portion of voir dire on the first day of trial, Bell wore leg shackles comprised of restraints around both ankles joined by a chain. (III J.A. at 1153.) Bell alleges that during an off-the-record chambers conference, his counsel objected to the shackles. As a result, it was agreed to remove the shackles in favor of leg weights that Bell wore under his pant legs and that were not visible to the jury. In noting the change on the record, the trial judge stated that while wearing the shackles, Bell "was positioned in the courtroom . . . so that the jury could not see." (III J.A. at 1153.) Bell alleges that the short time during which he wore shackles

-131-

impermissibly prejudiced the jury against him and violated the presumption of innocence to which he was entitled.

In support of his claim, Bell cites the affidavit of juror Connie P. Greer, first presented in his state habeas petition, who made a statement regarding a perceived lack of mitigation evidence presented on Bell's behalf during the penalty phase of trial. She stated that in viewing the defendant, "what I saw, including his shackles, was a mean looking person." (Greer Aff. ¶ 2, Pet'r's State App., Ex. 7.) Bell also cites the affidavit of his trial counsel, Jud Fischel, who stated that "[t]here was . . . no question that the jury could see the shackles." (Fischel Aff. ¶ 12, Pet'r's State App., Ex. 19.) Bell asserts that these statements prove the jury's awareness of his restraints and that they had an "undeniable effect" on jurors' perception of him.

The Supreme Court has held that three considerations militate against the use of shackles during a criminal trial: (1) the presumption that the defendant is innocent until proved guilty; (2) the right to counsel and to secure a meaningful defense; and (3) a dignified courtroom process. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970); *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *Coffin v. United States*, 156 U.S. 432, 458-59 (1895); *see also Deck v. Missouri*, 125 S. Ct. 2007 (2005).[26] The right

---

[26] The holding in *Deck v. Missouri*, 125 S. Ct. 2007 (2005), on which Bell relies strictly, extends the shackling prohibition to the penalty phase of trial. *Deck*'s holding is not relevant because Bell was not shackled in view of the jury during his trial's penalty phase.

to a presumption of innocence is relative to other rights, namely the safety of jurors, courtroom personnel, and trial spectators. *See United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970). Thus, the right to freedom of movement in the courtroom is not an absolute, unqualified right, although if the trial judge exercises the discretion to implement safety measures, she must articulate reasons for such actions on the record and outside the presence of the jury. *Id.*; *Brewster v. Bordenkircher*, 745 F.2d 913, 916 (4th Cir. 1984) (applying rule to state criminal proceedings).

Here, because Bell's substantive claim regarding his being shackled in view of the jury venire was found procedurally defaulted by the Supreme Court of Virginia, I may afford Bell relief only if he shows cause and prejudice sufficient to overcome the default. Bell asserts that his counsel's ineffectiveness at trial provides adequate cause. However, I may adopt Bell's reasoning only if I find that the Supreme Court of Virginia, in ruling on the merits of Bell's ineffective assistance claim, acted contrary to or unreasonably applied clearly established federal law, or unreasonably determined the facts in light of the evidence presented to that court. 28 U.S.C.A § 2254(d). I find that Bell fails to meet his burden.

As explained previously, *Strickland* sets out a two-pronged test for proving ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, counsel are ineffective only when counsel's performance at trial

-133-

was deficient, and the deficiency would have resulted in a different trial outcome. *Id*. Bell fails to meet his burden on either prong. As to the performance prong, it is true that Bell was shackled in the courtroom during a portion of voir dire, and that the trial judge failed to articulate any reason on the record for shackling Bell. The record is clear, however, that Bell's counsel objected to the shackling, though in an off-the-record conference, and that the trial court satisfactorily remedied the situation. While the remedy did not follow the letter of the procedure required by the law of this circuit, it does not appear from the record that counsel's performance was objectively unreasonable as required by *Strickland*.

Bell is also unable to prove prejudice. While Bell alleges that one juror recalled Bell's having been shackled, juror Greer does not allege that her vote to convict would have been different had Bell not been shackled. In fact, Greer's testimony related primarily to the mitigation evidence that was presented on Bell's behalf, rather than on any conclusion she drew regarding his guilt or innocence. Further, there is no allegation that any juror other than Greer actually saw the shackles. The trial judge noted on the record that Bell was positioned in the courtroom so that the jurors were unable to see his shackles, and that they were removed in favor of leg weights prior to the close of voir dire. While this does contradict the affidavit of Bell's trial counsel, under § 2254(e)(1) I must presume that the trial court's finding was correct.

-134-

In total, there are no allegations made by Bell to suggest that the outcome of his trial would have, in any way, been altered by his counsel's having objected earlier to his shackling. Bell fails to make out an ineffective assistance claim, and thus fails to overcome the Supreme Court of Virginia's finding of procedural default here.

Bell asserts that, at the least, he is entitled to an evidentiary hearing on the shackling issue. As has been summarized previously, because Bell failed to develop the factual basis of his claim during state court proceedings, I may not hold an evidentiary hearing on Bell's claim unless there is clear and convincing evidence that but for the constitutional error, Bell would have been found not guilty. 28 U.S.C.A § 2254(e). After reviewing the facts regarding this claim, I find that Bell fails to meet his burden under § 2254(e), and that I must also deny his request for an evidentiary hearing.[27]

### I. CLAIM IX—VIOLATION OF THE VIENNA CONVENTION ON CONSULATE RELATIONS.

In his ninth claim for relief, Bell contends that the state violated his rights under the Vienna Convention on Consular Relations which, upon the arrest of a foreign national, requires notification of the diplomatic representatives of the nation of which

---

[27] The case upon which Bell relies to make his claim for an evidentiary hearing, *Woodards v. Cardwell*, 430 F.2d 978, 981 (6th Cir. 1970), was decided before the AEDPA was revised in 1996 to further narrow the class of situations in which I may grant such a hearing.

the individual taken into custody is a citizen. Vienna Convention on Consular Relations ("Vienna Convention") art. 36, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 262, *available at* 1969 U.S.T. LEXIS 284. The Vienna Convention is a seventy-nine article, multilateral treaty governing the establishment of consular relations between nations and defining the functions of a consulate. *United States v. Emuegbunam*, 268 F.3d 377, 388 (6th Cir. 2001). Article 36 is entitled "Communication and contact with nationals of the sending State"[28] and provides:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

   (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

   (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be

---

[28] The sending state is the nation of the arrested foreign national, and the receiving state is the arresting nation. *United States v. Chaparro-Alcantara*, 226 F.3d 616, 620 n.1 (7th Cir. 2000).

-136-

forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c)    consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2.    The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention, 1969 U.S.T. LEXIS at *28-29.

Bell claims that Article 36 bestows a judicially enforceable individual right upon detained foreign nationals to consult with the consular officials of their country, and that his right was violated when the Winchester police failed to notify him of his right to communicate with the Jamaican consulate at the time he was arrested.

Before his trial, Bell filed a motion to suppress evidence and to dismiss the indictment because of this alleged violation. The trial court denied the motion, and,

-137-

on direct appeal, Bell asserted that the trial court erred by refusing to suppress his statement to the police.[29]  *Bell I*, 563 S.E.2d at 705.  The Supreme Court of Virginia rejected Bell's claim on direct appeal, finding that (1) the Winchester Police Department did not violate any rights that Bell had under Article 36 of the Vienna Convention, (2) even if there were a violation, the Vienna Convention does not create legally enforceable individual rights that a defendant may assert in a criminal proceeding to reverse a conviction, and (3) even if there were a legally enforceable individual right, suppression of evidence would not be an available remedy.  *Bell I*, 563 S.E.2d at 705-07.  On state habeas review, the Supreme Court of Virginia held that Bell's Vienna Convention claim was barred because the issue was raised and decided both in the trial court and on direct appeal.  *Bell II*, slip op. at 27.

The state habeas court cited *Henry v. Warden*, 576 S.E.2d 495, 496 (Va. 2003), for the proposition that claims decided at the trial court and on direct appeal are barred from state habeas review.  As explained above, however, a dismissal under *Henry* does not bar federal habeas review of claims that already may be properly considered by this court through their presentation on direct appeal.  *See Goins v. Angelone*, 226 F.3d 312, 320 n.3 (4th Cir. 2000) (recognizing that the rule in the precursor to *Henry*

_____

[29]  Bell did not assert on appeal that the trial court erred in refusing to dismiss the indictment.  *Bell I*, 563 S.E.2d at 705.

-138-

does not prevent federal habeas review of otherwise properly raised claims). Because this claim was adjudicated on the merits in state court, however, I must apply the deferential review set out in § 2254(d), and grant relief only if the state court decision contravened or unreasonably applied clearly established federal law. I find that the state court's decision denying this claim on direct appeal was reasonable and therefore must deny relief.

Evidence of record relevant to this claim for relief shows that shortly after his arrival at the police station, Bell told an investigative sergeant that he was born in Jamaica and had been in the United States for seven years. Thereafter, Bell was read his Miranda rights and answered questions for approximately thirty minutes. After the questioning ceased, the sergeant advised Bell that the Jamaican consulate would be advised of his arrest. Bell immediately stated that he did not want his consulate to be notified, but the sergeant explained that it was a mandatory process. Because of an oversight, it was not until thirty-six hours later that David Sobonya, a captain with the Winchester Police Department, faxed a notification of Bell's arrest to the Jamaican consulate in Washington, D.C. It does not appear from the record that the Jamaican consulate ever responded to this notification.

-139-

## 1. ALLEGED VIOLATION.

In its decision on direct appeal, the Supreme Court of Virginia first found that any rights that Bell has under Article 36 of the Vienna Convention were not violated. In reaching this conclusion, the state court first noted that the police told Bell the Jamaican consulate would be notified of his arrest, and also that actual notification was sent approximately thirty-six hours after Bell was taken into custody. *Bell I*, 563 S.E.2d at 705-06. The court explained that Article 36 requires only that notification be made "without delay" rather than immediately upon arrest or prior to interrogation, and concluded that the thirty-six hour time frame in Bell's case satisfied that requirement. *Id.* at 706. The court further held that because Bell objected to any notification being sent to his consulate, there was no violation of Article 36 resulting from the fact that the police did not expressly advise Bell of any rights he may have under the Vienna Convention. *Id.*

I find reasonable the state court's determination that the thirty-six hour time lapse in this case met the "without delay" requirement of Article 36. However, I am troubled by the state court's conclusion that simply because Bell objected to any notification being sent to his consulate, there was no violation of Article 36 arising from the Winchester Police Department's failure to expressly advise Bell of his right to communicate with the Jamaican consulate. As petitioner points out in his brief,

Case 7:04-cv-00752-JPJ   Document 92   Filed 02/07/06   Page 140 of 162   Pageid#: 1796

informing Bell that the police were required to contact the Jamaican consulate does not necessarily convey to Bell that he himself had a right under Article 36 to seek assistance from his consulate. Thus, while the Winchester Police Department discharged its duty to inform the Jamaican consulate without delay of Bell's arrest, they arguably failed to "inform the person concerned without delay of his rights under [the treaty]." Vienna Convention, 1969 U.S.T. LEXIS at *29. Nonetheless, I am not required to pass judgment on the reasonableness of the state court's decision on this issue, because I find that its determination that Bell lacks standing to assert a violation of the Vienna Convention was reasonable under § 2254(d).

## 2. STANDING.

The threshold question that must be addressed in order to determine whether Bell can obtain relief on his Vienna Convention claim is whether an individual foreign national has standing to assert a violation of Article 36. The Supreme Court of Virginia found that a foreign national has no such standing, and I find that this determination is reasonable under § 2254(d). Thus, I must deny relief on this claim.

As a general rule, international treaties do not create personal rights that an individual may enforce in the courts of its signatories. *See Emuegbunam*, 268 F.3d at 389. Indeed, there is a presumption that the rights created by an international treaty belong to a state and that private individuals cannot enforce them. *Id*. This

-141-

presumption can be overcome by express language in the treaty providing for particular judicial remedies or when the treaty creates fundamental rights on par with those protected by the Constitution. *Id.* at 390. Nonetheless, an individual enforcement right will not be inferred simply because a treaty provides for certain behavior by signatory states that happens to benefit individuals. *See State v. Sanchez-Llamas*, 108 P.3d 573, 577 (Or. 2005) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989), and *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975)).

Despite the presumption that a treaty does not confer individual rights, Bell argues that Article 36 confers rights to consular access that are enforceable by detained individuals in a judicial proceeding. Admittedly, Article 36 expressly refers to the detainee's "rights" to consular access and notification, but that alone does not demonstrate an intent to create private enforcement rights. This is especially true in light of the fact that "the treaty does not specify the nature of the declared 'rights' or any remedy that is required for their breach." *Sanchez-Llamas*, 108 P.3d at 577. Furthermore, the treaty's preamble focuses on the relationships between nations and expressly disclaims the creation of individual enforcement rights:

> Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems, realizing that the purpose of such

-142-

privileges and immunities is *not to benefit individuals* but to ensure the efficient performance of functions by consular posts on behalf of their respective States . . . .

Vienna Convention, 1969 U.S.T. LEXIS at *2-3 (emphasis added); *see Emuegbunam*, 268 F.3d at 392 (explaining that the Vienna Convention's preamble expressly disclaims the creation of individual rights); *State v. Navarro*, 659 N.W.2d 487, 491 (Wis. Ct. App. 2003) (explaining that the preamble unambiguously renounces the creation of individual rights); *but see Sanchez-Llamas*, 108 P.3d at 577 & n.7 (stating that the preamble does not contain a *clear* denial of an intent to create individual rights, but noting that the purposes stated in the preamble and in the initial clause of Article 36 suggest a concern with relationships and obligations among nations rather than individuals).

In addition to the general presumption that international treaties do not confer individual rights and the absence of any indication in the Vienna Convention of an intent to depart from this presumption, the State Department's consistent position on the issue supports the Supreme Court of Virginia's ruling that Article 36 does not confer individually enforceable rights. "[S]ince at least 1970, the State Department has maintained that the [Vienna Convention] does not create enforceable individual rights and that 'the only remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political, or exist *between [signatory] states*

-143-

under international law." *Sanchez-Llamas*, 108 P.3d at 577-78 (quoting *United States v. Li*, 206 F.3d 56, 63-64 (1st Cir. 2000) (emphasis supplied)). Given that the State Department is responsible for negotiating and administering treaties, this interpretation is entitled to great weight. *Sanchez-Llamas*, 108 P.3d at 578 (citing *Li*, 206 F.3d at 67 (Selya and Boudin, JJ., concurring)). Nonetheless, before passing on the reasonableness of the state court's decision, consideration must be given to international case law interpreting the treaty.

The International Court of Justice ("ICJ") has issued two opinions that address the United States' obligations under the Vienna Convention, *LaGrand Case (Germany v. United States)*, 2001 I.C.J. 466 (June 27), and *Case Concerning Avena and other Mexican Nationals (Mexico v. United States)*, 2004 I.C.J. 12 (March 31).[30] In *LaGrand*, Germany claimed that the United States had violated the consular rights of the German government and two German nationals who were not informed of their consular rights until several years after they had been arrested for murder in Arizona. *LaGrand*, 2001 I.C.J. at 471, 475. The ICJ found that "Article 36, paragraph 1, creates individual rights, which . . . may be invoked in [the ICJ] by the national State of the detained person." *Id.* at 494. As the Supreme Court of Virginia noted on direct

---

[30] Bell relies only on *LaGrand* in his petition, but both cases concern a foreign detainee's standing to assert Vienna Convention violations.

-144-

appeal, the ICJ in *LaGrand* did not go so far as to hold that Article 36 of the Vienna Convention creates individually enforceable legal rights that a detainee may assert in a domestic criminal proceeding to reverse a conviction. *Bell I*, 563 S.E.2d at 706; *see also Navarro*, 659 N.W.2d at 493 (reaching the same conclusion). However, a few years later in *Avena*, the ICJ explained that "what is crucial in the review and reconsideration process is the existence of a procedure which guarantees that full weight is given to the violation of the rights set forth in the Vienna Convention, whatever may be the actual outcome of such review and reconsideration." *Avena*, 2004 I.C.J. at 65. Thus, *Avena* did hold that the United States has an obligation to permit detainees to raise Article 36 claims in our domestic courts. *See Jogi v. Voges*, 425 F.3d 367, 383 (7th Cir. 2005).

While *Avena* and, to a lesser degree, *LaGrand* support Bell's contention that Article 36 of the Vienna Convention creates individually enforceable rights of consular notification, these ICJ decisions do not constitute binding precedent on domestic cases involving different parties. The statute of the ICJ states that its decisions have "no binding force except between the parties and in respect of that particular case." Statute of the International Court of Justice, Article 59. "Just as I.C.J decisions are not considered binding precedent by the I.C.J, nor are they considered authoritative statements of international law in domestic courts." *United*

*States v. Hall*, No. CR-03-910(CPS), 2005 U.S. Dist. LEXIS 24879, *33 (E.D.N.Y. Aug. 17, 2005). Furthermore, the United States is no longer a party to the Optional Protocol to the Vienna Convention, which provides that "[d]isputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the [ICJ]." Vienna Convention, Optional Protocol art. I, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 262, *available at* 1969 U.S.T. LEXIS 284, at *169 ("Optional Protocol"). While the United States was a party to the Optional Protocol until recently, on March 7, 2005, President Bush, through the Secretary of State, notified the United Nations that the United States had formally withdrawn from the jurisdiction of the ICJ in disputes over Vienna Convention claims. *See Medellin v. Dretke*, 125 S. Ct. 2088, 2101 (2005) (O'Connor, J., dissenting) (citing Letter from Condoleezza Rice, Secretary of State, to Kofi A. Annan, Secretary General of the United Nations (Mar. 7, 2005)).

The Supreme Court has not yet addressed the issue directly, but Bell argues that *Breard v. Greene*, 523 U.S. 371 (1998), stands for the proposition that individuals have enforceable rights under the Vienna Convention. However, although the *Breard* Court noted that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," the Court ultimately found that the defendant's claim was barred on procedural grounds and thus declined to decide the

-146-

issue of standing. *Breard*, 523 U.S. at 376. Furthermore, the *Breard* Court noted that "neither the text nor the history of the Vienna Convention clearly provides a foreign nation a private right of action in United States' courts to set aside a criminal conviction and sentence for violation of consular notification provisions." *Id*. at 377. Given that the Court expressed doubt as to a signatory nation's right of action in United States courts, it is unlikely it would hold that an individual foreign detainee could pursue such an action. *See Emuegbunam*, 268 F.3d at 394; *Navarro*, 659 N.W.2d at 493; *State v. Martinez-Rodriguez*, 33 P.3d 267, 274 (N.M. 2001).

In light of the *LaGrand* and *Avena* cases, the Supreme Court's vague comments on whether Article 36 is individually enforceable, the State Department's position on the issue, and the general presumption that international treaties do not confer individual rights, "[i]t remains an open question whether the Vienna Convention gives rise to any individually enforceable rights." *United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001). Indeed, one circuit has held that the Vienna Convention confers individual rights, other circuits have held that it does not, and still others have stated that it remains unclear. *See United States v. Villa-Ortega*, 2005 U.S. Dist. LEXIS 28234, at *11 (D. Kan. 2005) (citing a Seventh Circuit case holding it does confer individual rights; First, Second, Fifth, and Sixth Circuit cases holding that it does not confer individual rights; and Third, Ninth, and Tenth Circuit cases

stating that it is unclear). Because no clearly established federal law directs that Article 36 creates an individually enforceable right to consular access, it cannot be said that the Supreme Court of Virginia's determination that it does not confer such a right is contrary to, or involves an unreasonable application of, clearly established federal law.[31] *See* 28 U.S.C.A. § 2254(d). Thus, I must deny relief on this claim.

### 3. PREJUDICE.

Furthermore, even if Bell had individually enforceable rights under the Vienna Convention, he failed to show that he was prejudiced as a result and thus cannot prevail. *See Murphy v. Netherland*, 116 F.3d 97, 100-01 (4th Cir. 1997). Bell asserts in his petition that, had he been advised of his right under the Vienna Convention, he would have contacted a Jamaican consular officer who would have counseled him not to make statements to the police outside the presence of counsel. However, Bell was informed of his right to remain silent by the officers who interrogated him and yet he chose to make statements. Also relevant to the prejudice inquiry is the fact that the

---

[31] The Supreme Court has recently granted certiorari in two cases that raise issues under the Vienna Convention. *See Sanchez-Llamas v. Oregon*, 126 S.Ct. 823 (2005); *Bustillo v. Johnson*, 126 S.Ct. 823 (2005). Thus, the effect that the *Avena* case will have in our domestic courts and accordingly the question of whether Article 36 confers individually enforceable rights may be resolved. This does not change the fact that, at the time the Supreme Court of Virginia decided Bell's Vienna Convention claim, there was no clearly established federal law on the issue.

-148-

circumstantial evidence against Bell was substantial. Thus, Bell cannot show he was prejudiced by any alleged violation of the Vienna Convention.

4. REMEDY.

Moreover, suppression of Bell's statements would not have been a proper remedy even if Bell had standing and could show prejudice. Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it, and there is no exclusionary rule generally applicable to violations of international law. *United States v. Chaparro-Alcantara*, 226 F.3d 616, 621 (7th Cir. 2000). The Supreme Court has held that treaties are on equal footing with statutes, and thus the rights protected by the Vienna Convention are equivalent to those protected by a statute. *Id*. Accordingly, "the exclusionary rule is an appropriate sanction for a violation of a treaty provision only when the treaty provides for that remedy." *Id*. There is nothing in the text of the Vienna Convention indicating that suppression of evidence is the appropriate remedy for violations of Article 36. *Id*. (citing *United States v. Ademaj*, 170 F.3d 58, 67 (1st Cir. 1999) (holding that "the Vienna Convention itself prescribes no judicial remedy or other recourse for its violation"); *see also United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) (en banc) ("We hold that irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or

dismissal of the indictment.").  Indeed, "American courts have held with near unanimity that suppression is not an appropriate remedy for a violation of the Vienna Convention, assuming it creates an individual right."  *See Hall*, 2005 U.S. Dist. LEXIS 24879, at *36-37 (listing cases).  Thus, the Supreme Court of Virginia's resolution of Bell's Vienna Convention claim was undoubtedly reasonable under § 2254(d).

## J. CLAIM X—DEFECTS IN VIRGINIA'S DNA TESTING PROCEDURES.

Bell next contends that defects in Virginia's DNA testing procedures entitle him to habeas relief.  At trial, the state presented the testimony of forensic expert Karen Ambrozy, who explained that forensic testing of the DNA recovered by swabbing the grips, butt, trigger, and trigger guard of the gun used to shoot Timbrook could not eliminate Bell as a co-contributor of the DNA, which was consistent with a mixture of DNA from at least three individuals.  *Bell I*, 563 S.E.2d at 702.  Bell notes that the obvious implication of such evidence is that Bell did indeed handle the weapon, and that the jury likely weighed this evidence heavily for the simple reason that DNA evidence is often perceived to be infallible.  Bell argues that this DNA evidence that could neither include or exclude Bell as a co-contributor of the DNA conflicts with the DNA evidence one would expect to find if the weapon were truly Bell's.  To support this contention he notes (1) that both Billie Joe Swartz and Aretta Terry

-150-

testified that Bell regularly engaged in target practice and that the police found a wide range of bullets in Bell's home, and (2) that Ambrozy testified that a frequently used object is likely to be testable for one person's DNA. Based on this reasoning, Bell claims that the DNA evidence presented by the state was low-level and potentially inaccurate, that his counsel were deficient to the extent that they failed to raise this claim at trial or on direct appeal, and that, if the DNA evidence in his case has been destroyed, his Fourteenth Amendment due process rights have been violated.

Bell did not present these speculative claims at trial, on direct appeal, or in his state habeas petition, and thus they are foreclosed from federal habeas review. As explained above, under § 2254(e)(2), a petitioner cannot present a new claim for the first time on federal habeas review unless (1) he was diligent in developing his claim in state court or (2) he was not diligent but his claim relies on either a new rule of constitutional law made retroactive by the Supreme Court or new facts that could not have been previously discovered through the exercise of due diligence *and* the facts would be sufficient to establish, by clear and convincing evidence, that but for the constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense. *Williams v. Taylor*, 529 U.S. 420, 435-36 (2000). The only argument Bell makes to support his contention that the DNA evidence presented by the state was potentially erroneous is the testimony of two witnesses who stated that

-151-

Bell often engaged in target practice, the fact that police found a wide range of bullets at Bell's home, and the testimony of Ambrozy who stated that a frequently used object is likely to be testable for one person's DNA. All of this evidence was available to trial and appellate counsel, and thus it cannot be said that Bell was diligent in pursuing this claim. With respect to the ineffective assistance argument, the failure of trial and appellate counsel to raise these DNA claims was readily apparent to Bell's state habeas counsel, and thus Bell cannot be said to have been diligent on this claim either. Because Bell cannot make the more stringent showing necessary to present a new claim when diligence is lacking, the DNA claims are barred by § 2254(e).

Despite the fact that Bell never presented any of these claims to the state court, he argues that they are not foreclosed from review because of Virginia's newly created writ of actual innocence. The relevant Virginia statute provides that, "[n]otwithstanding any other provision of law or rule of court, upon a petition of a person who was convicted of a felony upon a plea of not guilty, the Court of Appeals shall have the authority to issue writs of actual innocence. . . ." Va. Code Ann. § 19.2-327.10 (Michie 2004). While human biological evidence may not be used as the sole basis for relief under this writ, it may be used in conjunction with other evidence. Va. Code Ann. § 19.2-327.11 (Michie 2004). However, in petitioning the Court of Appeals for such a writ, a petitioner must allege, among other things, that the evidence

-152-

supporting the allegation of innocence was "unknown or unavailable to the petitioner

or his trial attorney of record at the time the conviction became final" and "that the

previously unknown or unavailable evidence is such as could not, by the exercise of

diligence, have been discovered or obtained before the expiration of 21 days following

entry of the final order of conviction." *Id*.  As explained above, all of Bell's evidence

supporting his claim that the DNA evidence against him was potentially erroneous

was available at the time of his trial.  Despite the fact that this evidence was known

all along, Bell does not allege that he has ever requested further DNA testing until

now.  Therefore, he cannot meet the standard for Virginia's writ of actual innocence.

Moreover, even if Bell could successfully petition for a writ of actual innocence, it is

clear that the Virginia legislature did not intend that a pending or potential petition for

writ of actual innocence should delay or stay postconviction proceedings in this court.

*See id*.  ("Nothing in this chapter shall constitute grounds . . . to delay or stay any

other postconviction appeals or petitions to any court.").  Accordingly, Virginia's writ

of actual innocence process does not cure Bell's failure to assert this claim in state

court, and it is thus foreclosed from review in federal court.

## K. CLAIM XI—UNCONSTITUTIONALITY OF VIRGINIA'S ADMINISTRATION OF THE DEATH PENALTY.

In his eleventh claim for relief, Bell attacks the constitutionality of Virginia's administration of the death penalty at the trial level, on appeal, and at the postconviction review stage. First, with respect to the trial and direct appeal stages, Bell complains that the death penalty scheme in Virginia is unconstitutional under the Eighth and Fourteenth Amendments due to geographic disparity in the prosecution of capital offenses, the role that race plays in the imposition of the death penalty, the disproportionate number of lower-income defendants sentenced to death, and low reversal rates. To the extent that the factual basis of this claim existed at the time of Bell's trial and direct appeal proceedings, Bell contends that his counsel were deficient for failing to raise such arguments in support of their claim that the death penalty as applied in Virginia is unconstitutional.

Bell presented these claims regarding the alleged defects in the trial and direct appeal stages of his case and his associated ineffective assistance of counsel claim in his state habeas petition, and the Supreme Court of Virginia found that the claims had no merit under settled precedent. *Bell II*, slip op. at 25. Therefore, in order to prevail, Bell must show that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

-154-

law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence" presented to the state court. 28 U.S.C.A. § 2254(d)(1), (2).

Bell cannot make this showing with respect to these claims. Bell relies on the Joint Legislative Audit and Review Commission ("JLARC") report, which sets forth a statistical analysis of the application of the death penalty in Virginia.[32] The JLARC statistics do not prove that geographic location, race, wealth, or some impermissible review factor enters into any capital sentencing decisions, or that such circumstances were a factor in Bell's particular case. *See* JLARC report at III; *see also McCleskey v. Kemp*, 481 U.S. 279, 308 (1987). Both the Supreme Court and the Fourth Circuit have held that statistical information alone is insufficient to prove the types of claims Bell asserts. *See McCleskey*, 481 U.S. at 297; *Roach v. Martin*, 757 F.2d 1463, 1481 (4th Cir. 1985); *Briley v. Booker*, 746 F.2d 225, 227 (4th Cir. 1984). Therefore, the Supreme Court of Virginia's determination that Bell's claim on the constitutionality of Virginia's application of the death penalty lacked merit was in accordance with

_____

[32] The JLARC report is the product of a year-long study of capital punishment commissioned by the Virginia General Assembly. Joint Legislative Audit and Review Commission of the Virginia General Assembly, *Review of Virginia's System of Capital Punishment* (2000), *available at* http://jlarc.state.va.us/reports/rpt274.pdf. The study focuses on "two key aspects of capital punishment in Virginia: the use of prosecutorial discretion by Commonwealth Attorneys in the application of the State's death penalty statutes; and the fairness of the judicial review process for persons who have been sentenced to die." *Id.* at Preface.

-155-

federal law and was not unreasonable. For these same reasons, the state court's decision that the associated ineffective assistance of counsel claim satisfied neither the "performance" nor the "prejudice" prong of *Strickland* was also reasonable. Accordingly, I must deny relief on these claims.

Secondly, in another portion of Claim XI, Bell contends that Virginia's postconviction review process violated his constitutional rights under the Fourteenth Amendment because the Supreme Court of Virginia limited him to fifty pages in his state habeas petition, refused to appoint a mental health expert, and determined various disputed facts without an evidentiary hearing. This claim must fail, however, because a challenge to state habeas corpus proceedings cannot provide a basis for federal habeas relief. *See Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir. 1998). A federal court "shall entertain an application for a writ of habeas corpus . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a). "This does not provide a basis for a challenge to a ruling in a state postconviction proceeding, because the petitioner is not 'detained as a result of a decision of the Supreme Court of Virginia in the state habeas action,' but rather is in custody pursuant to the original trial court." *Orbe v. True*, 233 F. Supp. 2d 749, 787 (E.D. Va. 2002) (citing *Wright*, 151 F.3d at 159). Accordingly, I must deny relief on this claim.

## L. CLAIM XII—UNCONSTITUTIONALITY OF VIRGINIA'S EXECUTION PROCEDURES.

In his final claim for relief, Bell attacks the constitutionality of Virginia's execution procedures. Specifically, he argues that both electrocution and lethal injection, the two execution methods employed in Virginia, violate his Eighth and Fourteenth Amendment rights. He contents that the combination of chemicals used for lethal injection in Virginia—sodium thiopental, pancuronium bromide, and potassium chloride—creates a strong possibility of unnecessary suffering that is increased by the lack of physician involvement in the execution process, and that electrocution is needlessly cruel and thus offends our evolving standards of decency.

The state argues that this claim is procedurally barred, but I find that the exhaustion requirement has been met and the claim is properly before this court. While Bell did not present this claim in his state habeas petition, he challenged Virginia's execution procedures on direct appeal and the Supreme Court of Virginia decided the claim on the merits. It is well established that "the exhaustion requirement does not demand that a petitioner raise on collateral review a claim that has been fully considered by the state court on direct review." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) (citing *Brown v. Allen*, 344 U.S. 443, 447 (1953)). As long as a claim has been fairly presented to the state court, the exhaustion requirement is met. *Id.* Thus, because Bell presented this claim on direct appeal, the fact that Bell

-157-

did not raise it in his state habeas petition does not prevent review in this court. Furthermore, while Bell does present more detail in his federal habeas petition supporting his contention that lethal injection is inhumane, these additional arguments did not "fundamentally alter the legal claim already considered by the state courts" and thus federal habeas review is not precluded. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Because this claim was adjudicated on the merits in state court, I must apply the deferential review set out in § 2254(d) and can grant relief only if the state court decision contravened or unreasonably applied clearly established federal law. In its decision on Bell's execution procedures claim, the Supreme Court of Virginia first explained that it had previously "ruled that execution of prisoners by electrocution does not violate the Eighth Amendment's prohibition against cruel and unusual punishment." *Bell I*, 563 S.E.2d at 715 (citing *Ramdass v. Commonwealth*, 437 S.E.2d 566, 569 (Va. 1993)). The court went on to say that although it had never determined whether lethal injection was unconstitutional, Bell's claim and supporting evidence that lethal injection posed an unwarranted risk of extreme pain and suffering was not sufficient to warrant an evidentiary hearing on the issue. *Id*. The court noted that it rejected this same type of argument when upholding the constitutionality of death by electrocution. *Id*. (citing *Martin v. Commonwealth*, 271 S.E.2d 123, 125

Case 7:04-cv-00752-JPJ   Document 92   Filed 02/07/06   Page 158 of 162   Pageid#: 1814

(Va. 1980), and *Ramdass*, 437 S.E.2d at 569). The court further noted that pursuant to Virginia's death penalty scheme, Bell has the right to choose between lethal injection and electrocution. *Id*. The court concluded that "[b]ecause Bell has that choice and we have already ruled that execution by electrocution is permissible under the Eighth Amendment, it would be an unnecessary adjudication of a constitutional issue to decide whether lethal injection violates the Eighth Amendment." *Id*.

I find that the state court's decision denying this claim on direct appeal reasonably applies federal law. First, existing precedent holds that electrocution is not an unconstitutional method of execution. *See In re Kemmler*, 136 U.S. 436, 449 (1890); *Poyner v. Murray*, No. 93-6052, 1993 U.S. App. LEXIS 38227, *6 (4th Cir. 1993) (unpublished); *Ralph v. Warden*, 438 F.2d 786, 789 (4th Cir. 1970); *Ramdass v. Commonwealth*, 437 S.E.2d 566, 569 (Va. 1993), *vacated in part on other grounds*, 512 U.S. 1217 (1994). Thus, the Supreme Court of Virginia's holding on that issue certainly squares with federal law.

Secondly, the state court's determination that it was unnecessary to decide the constitutionality of lethal injection given the availability of electrocution as a method of execution was also reasonable. In *Stewart v. LaGrand*, 526 U.S. 115 (1999), an Arizona inmate argued that execution by lethal gas violated the Eighth Amendment. Under Arizona law, inmates could choose execution by either lethal gas or lethal

-159-

injection, and LaGrand chose lethal injection. *See id*. at 119. The Supreme Court held that LaGrand waived his habeas claim that execution by lethal gas was unconstitutional because he had chosen to die by lethal gas. *Id*. The same analysis applies to Bell's case even though he has not yet chosen his form of execution. *See Stanford v. Parker*, 266 F.3d 442, 462 (6th Cir. 2001). For Bell's lethal injection claim to be relevant, he would first have to choose it over electrocution, the constitutionality of which has been established by existing precedent. *Id*. If he does so choose lethal injection, however, he waives his right to object to it under *Stewart*. *Id*.

Lastly, thirty-seven states and the federal government authorize execution by lethal injection, and I am aware of no court decision, federal or state, that has found execution by lethal injection unconstitutional. *See Reid v. Johnson*, 333 F. Supp. 2d 543, 552 (E.D. Va. 2004) (citing *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004)). Indeed, the several state and federal courts that have considered the issue have concluded that lethal injection is constitutional. *See, e.g., LaGrand v. Lewis*, 883 F. Supp. 469, 470-71 (D. Ariz. 1995) (finding lethal injection constitutional and citing several other cases that have so held), *aff'd*, 133 F.3d 1253 (9th Cir. 1998); *People v. Snow*, 65 P.3d 749, 800-01 (Cal. 2003); *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997) (finding petitioner had failed to demonstrate that Arizona's lethal injection

protocol would violate his constitutional rights). Thus, I find the Supreme Court of Virginia's decision on this claim reasonable and deny relief.

As an alternative to granting him relief on this claim, Bell asks this court for an evidentiary hearing based on the new details proffered in his federal habeas petition. First, Bell arguably failed to fully develop the factual basis of his claim in state court, which would preclude an evidentiary hearing on the newly introduced details of his claim. *See* 28 U.S.C.A. § 2254(e)(2). Moreover, even accepting Bell's new facts concerning the pain and terror involved in lethal injection and electrocution as proven, they do not as a matter of law establish an Eighth Amendment violation and thus no evidentiary hearing on this claim is necessary. Death by execution has always involved the possibility of pain and terror, and although our evolving standard of decency may at times require reassessment as to what degree or length is tolerable, Bell's proffered evidence does not demonstrate that the challenged methods so depart from contemporary notions of civilized conduct that reassessment by this court at this time would be proper.[33] *See Gray v. Lucas*, 710 F.2d 1048, 1061 (5th Cir. 1983).

---

[33] The Supreme Court recently granted certiorari in a case involving execution by lethal injection. *Hill v. Crosby*, No. 05-8794, 2006 U.S. LEXIS 1074 (U.S. Jan. 25, 2006). It appears that the issue before the Court is whether a death row inmate can pursue such a claim after his habeas rights have been exhausted. *See Hill v. Crosby*, No. 06-10621, 2006 U. S. App. LEXIS 1674 (11th Cir. Jan. 24, 2006) (holding that action was functional equivalent of successive habeas petition).

Therefore, Bell's request for an evidentiary hearing on the matter must be denied.

## IV. CONCLUSION.

For the reasons stated, it **ORDERED** as follows:

1.     The state's motion to dismiss is granted in part and denied in part;

2.     An evidentiary hearing will be held on the petitioner's claim that he received ineffective assistance of counsel by virtue of the failure of his attorneys to present available evidence in mitigation at the sentencing phase of his trial; and

3.     All other claims for relief presented by the petitioner are denied.

ENTER: February 7, 2006

 /S/ JAMES P. JONES
Chief United States District Judge